[No. B165638. Second Dist., Div. Eight. Sept. 14, 2004.]

CECILE ALCH et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
TIME WARNER ENTERTAINMENT, et al., Real Parties in Interest.

[No. B166009. Second Dist., Div. Eight. Sept. 14, 2004.]

HINDI BROOKS et al., Plaintiffs and Appellants, v.
WILLIAM MORRIS AGENCY, INC., et al., Defendants and Respondents.

[No. B170564. Second Dist., Div. Eight. Sept. 14, 2004.]

HINDI BROOKS, et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
WILLIAM MORRIS AGENCY, INC., Real Party in Interest.

[No. B170629. Second Dist., Div. Eight. Sept. 14, 2004.]

CECILE ALCH et al., Plaintiffs and Appellants, v.
TIME WARNER ENTERTAINMENT, et al., Defendants and Respondents.

COUNSEL

Sprenger & Lang, Paul C. Sprenger, Steven M. Sprenger, Daniel Wolf; Schwartz, Steinsapir, Dohrmann & Sommers, Dolly M. Gee, William T. Payne; Kator, Parks & Weiser, Maia Caplan; AARP Foundation Litigation, Thomas W. Osborne, Daniel B. Kohrman, Laurie A. McCann; and Robert S. Gerstein for Petitioners and for Plaintiffs and Appellants.

No appearance for Respondent Superior Court.

Munger, Tolles & Olson, Vilma S. Martinez, Glenn D. Pomerantz, Mark H. Epstein, Allison B. Stein and Malcolm A. Heinicke for Real Parties in Interest and for Defendants and Respondents Universal Television, Incorporated, Universal Television Entertainment, Inc., Universal Television Enterprises, Inc., Universal Television Enterprises Productions, Inc., Universal Studios Network Programming f/k/a Brillstein Grey Entertainment, Fox Entertainment Group, Inc., Fox Broadcasting Company, Twentieth Television, Inc., Twentieth Century Fox Television, a division of Twentieth Century Fox International Television, Inc., Regency Television LLC, and The Greenblatt Janollari Studio, Inc.

Irell & Manella, James N. Adler, Henry Shields, Jr., and Harry A. Mittleman for Real Parties in Interest and for Defendants and Respondents National Broadcasting Company, Inc., and NBC Studios, Inc.

O'Melveny & Myers, Gordon E. Krischer, Apalla U. Chopra, Eric Amdursky and Adam J. Karr for Real Parties in Interest and for Defendants and Respondents The WB Television Network Partners, L.P., Warner Bros. Television Production, a division of Time Warner Entertainment Company, L.P., and Castle Rock Television, Inc.

Paul, Hastings, Janofsky & Walker, Paul Grossman, J. Al Latham, Jr., and Michele A. Freedenthal for Real Parties in Interest and for Defendants and Respondents The Walt Disney Company, ABC, Inc., Miramax Film Corp., Walt Disney Pictures and Television, Touchstone Television Productions, LLC, and Buena Vista Television.

Mitchell, Silberberg & Knupp, William L. Cole, Patricia H. Benson, Kevin E. Gaut, Adam Levin and Seth E. Pierce for Real Party in Interest and for Defendant and Respondent Columbia Tristar Television, Inc.

White O'Connor Curry & Avanzado, James E. Curry and Mary Catherine Woods for Real Parties in Interest and for Defendants and Respondents Studios USA, LLC, and USA Networks, Inc.

Morgan, Lewis & Bockius, George A. Stohner, Robert Jon Hendricks, Nicole A-J. Gustafson; Grace E. Speights, Anne M. Brafford; Thomas M. Peterson and Emily Cope for Real Parties in Interest and for Defendants and Respondents Viacom, Inc., Dreamworks SKG TV LLC, The Carsey-Werner Company, LLC, Carsey-Werner Productions, LLC, Paramount Studios, CBS Broadcasting, Inc., Spelling Entertainment Inc., Spelling Television Inc., Spelling Daytime Television Inc., Aaron Spelling Productions, Inc., Big Ticket Television, Inc., and Big Ticket Productions, Inc.

Rintala, Smoot, Jaenicke & Rees, William T. Rintala, Michael B. Garfinkel and Heather M. Noelte for Defendant and Respondent and Real Party in Interest William Morris Agency, Inc.

Knee & Ross and Howard Knee for Defendant and Respondent The Irv Schechter Company.

Gibson, Dunn & Crutcher, Nancy P. McClelland and Lisa A. Barr for Defendant and Respondent International Creative Management, Inc.

Greenberg Glusker Fields Claman Machtinger & Kinsella, Ann Kane Smith and Daniel P. Hoffer for Defendants and Respondents Paradigm Talent & Literary Agency and Shapiro-Lichtman, Inc.

Epstein, Turner & Song, Lawrence J. Song and Jonathan Turner for Defendant and Respondent The Gersh Agency, Inc.

Alschuler Grossman Stein & Kahan, Marcia J. Harris, Mary Lee Wegner and David B. Dreyfus for Defendant and Respondent Broder Webb Chervin Silberman Agency (formerly Broder Kurland Webb Uffner Agency, Inc.).

Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, Patricia L. Glaser, Mark L. Block and Allison S. Hyatt for Defendant and Respondent The Endeavor Agency, Inc.

Proskauer Rose, Anthony J. Oncidi, Harold M. Brody, Christine de Bretteville and Russell A. Wetanson for Defendant and Respondent Creative Artists Agency, LLC.

Quinn Emanuel Urquhart Oliver & Hedges, Phyllis Kupferstein and Erika Lynn Kleiman for Defendant and Respondent United Talent Agency, Inc.

Kaye Scholer, Robert Barnes, J. Andrew Sjoblom and J. Raymond Warner for Defendant and Respondent Agency for the Performing Arts, Inc.

Brad Seligman and Jocelyn D. Larkin for The Impact Fund, Asian Pacific American Legal Center of Southern California, Equal Rights Advocates, Lawyers' Committee for Civil Rights, Legal Aid Society—Employment Law Center and Public Advocates, Inc., as Amici Curiae on behalf of Petitioners and Plaintiffs in B165638 and for Plaintiffs and Appellants in B166009.

## OPINION

## BOLAND, J.—

### SUMMARY

These appeals and writ petitions involve 23 separate class action lawsuits filed by hundreds of television writers against (a) 12 different groups of related television networks, studios and production companies (collectively, employers or networks and studios), and (b) 11 talent agencies. The writers, who are over the age of 40 and members of the Writers Guild of America (WGA), assert that each of the networks and studios has for many years maintained a systemwide policy or practice of age discrimination. The talent agencies, which represent writers seeking television writing opportunities, are alleged to be well aware of the pattern or practice of age discrimination by the employers, and to engage in a pattern or practice of discrimination of their own by refusing to represent and refer older writers to the networks and studios for writing opportunities, instead referring their younger clients. Some of the writers allege they applied and were rejected for television writing employment by the employers, or for representation by the talent agencies. Many more writers allege they were deterred from seeking television writing employment, or representation by the talent agencies for the purpose of obtaining television writing opportunities, as a result of each employer's and talent agency's discriminatory practices.

These lawsuits come to us with a significant history. Many of the same writers (51 of them, or about one-third) first sought relief in federal court, filing a single class action lawsuit against all of the networks, studios and talent agencies. The federal suit resulted in an order dismissing several of the writers' claims with prejudice, and dismissing other claims without prejudice and with leave to amend. (*Wynn v. National Broadcasting Co., Inc.* (C.D.Cal. 2002) 234 F.Supp.2d 1067 (*Wynn*).) After the federal court's ruling, the writers voluntarily dismissed all remaining causes of action without prejudice. They, along with more than 100 other writers, then filed the 23 lawsuits that are now, after demurrer rulings by the trial court, the subject of two sets of appeals and two successive writ petitions, all of which we are considering concurrently.

We summarize our principal conclusions as follows:

1. Government Code section 12965, subdivision (b), provides that a Fair Employment and Housing Act (FEHA) action may not be filed or maintained as a class action where the persons claiming to be aggrieved "have filed a civil class action in the federal courts alleging a comparable claim of employment discrimination" against the same defendants. We construe this provision to proscribe concurrent, not successive, class actions, and conclude it does not bar the writers who filed and dismissed claims in *Wynn* from filing a FEHA class action in state court.

2. The claims of "deterred applicants"—writers who did not apply for television writing opportunities or agency representation during the limitations period, allegedly because of a long-standing and long-known policy of discrimination against older writers—are not barred by FEHA's one-year statute of limitations.

3. The writers have properly alleged classwide claims of a pattern or practice of age discrimination in violation of FEHA, and are not required to plead facts supporting individual prima facie cases of discriminatory refusal to hire as a predicate for their classwide claims.

4. Claims asserted by "deterred applicants" of a classwide pattern or practice of discrimination may not be dismissed at the pleading stage on the ground that statistics alleged in the federal complaint in *Wynn*—e.g., that writers over 40 comprised one-third or more of the writing staffs of most employers in 1997/1998—were inconsistent with viable deterred applicant claims.

5. The writers did not waive appellate review of their FEHA or Unruh Civil Rights Act class claims by declining to assert individual FEHA claims or refusing to amend their Unruh Civil Rights Act class claims in their second amended complaints.

6. The writers' first amended complaints sufficiently pled a classwide claim against the talent agencies for aiding and abetting violations of FEHA by the employers.

7. Allegations that the talent agencies systematically refuse to represent older writers seeking television writing opportunities are cognizable under the Unruh Civil Rights Act.

8. Amendments to FEHA effective on January 1, 2003, adding age to the bases of discrimination constituting unlawful employment practices by employment agencies, do not apply retroactively.

9. The trial court erred in ruling that the writers must allege potential competitive harm or likely consumer deception in order to state a claim under the unfair competition law. (Bus. & Prof. Code, § 17200 et seq.)

10. The trial court correctly concluded it has no authority under the unfair competition law to effectuate an injunctive decree through an award of classwide backpay.

## FACTUAL AND PROCEDURAL BACKGROUND

These 23 class action lawsuits were filed after the dismissal of a class action age discrimination lawsuit filed by some of the same plaintiffs against all of the same defendants in federal court. (*Wynn, supra*, 234 F.Supp.2d 1067.) We begin by providing background information on the hiring process for television writers and the writers' claims in this litigation. Since the details of the *Wynn* case are pertinent to some of the issues in the appeals and writ petitions before us, we summarize that lawsuit and its results. We then turn to a description of the 23 lawsuits filed in the superior court; the trial court's January 16, 2003 rulings in those actions; the ensuing "death knell" appeals, writ petitions and motion to dismiss the appeals; the trial court's August 14, 2003 rulings; and the subsequent writ petition and death knell appeals.

### 1. *Background information.*

The hiring process for television writers is similar throughout the television industry, but quite different from the ordinary job application process. Television writing opportunities are not publicly advertised, and resumés or scripts are not accepted from the general public. Instead, networks or studios communicate the availability of television writing opportunities in WGA publications, through talent agents and by word of mouth. A writer generally seeks a television writing opportunity by submitting a script through a talent agency, or by obtaining an interview or "pitch meeting" with a television hiring official through personal connections. In the usual case, the writer procures an agent, who submits a script or information about the writer's background and writing history to a studio or network hiring official. The hiring official, alone or with others, rejects or hires the applicant for a particular show or project. In some cases, licensing agreements for the show or project also require the approval of the writer by the other party to the licensing agreement.

In this litigation, the writers allege that the networks and studios have a youth-oriented corporate culture that indiscriminately favors youth over age and experience. Desiring to attract younger viewing audiences in order to

generate higher advertising revenues, the networks and studios seek out and hire younger writers to the exclusion of older writers. The networks and studios invidiously stereotype older writers as unable to write television programming that will attract the desired demographic audience, or as lacking the vitality necessary to meet the demands of modern television writing. The writers allege the networks and studios have engaged in a pattern and practice of intentional age discrimination for many years, and they cite several public statements by employees and agents of various studios and networks as evidence of the employers' desire to hire younger writers to the exclusion of older writers. The talent agencies, the writers assert, are well aware of the employers' pattern and practice of age discrimination, and have a financial incentive to discriminate themselves by refusing to represent and refer older writers to the employers, since the success of the talent agencies depends on referring writers who are most acceptable to the employers. The writers cite various comments by agents to writers as evidence of each agency's pattern or practice of age discrimination.

### 2. *Wynn v. National Broadcasting Co., Inc.*

In October 2000, 51 writers filed a single class action lawsuit in federal court against all of the networks, studios and talent agencies which are parties to this appeal and writ petition. The action was brought under the Age Discrimination in Employment Act (29 U.S.C. § 621 et seq. (ADEA)), FEHA, and New York State's Human Rights Law, and alleged an industry-wide pattern or practice of age discrimination. The complaint cited conclusions and statistics from a WGA study of the 1997/1998 television season. The 40 network and studio defendants and the 11 talent agency defendants filed motions to dismiss and, in the alternative, to sever both plaintiffs and defendants as improperly joined. In a lengthy opinion, on January 24, 2002, Judge Stephen V. Wilson granted the motions to dismiss in part, and granted the motions to sever. (*Wynn, supra,* 234 F.Supp.2d 1067.) As pertinent here, the court:

1. Dismissed with prejudice:

i. the writers' claims against the talent agencies under the ADEA and the FEHA;

ii. all claims alleging joint and several liability for industrywide discrimination;

iii. claims of aiding and abetting under the ADEA; and

iv. conspiracy claims against the employers under FEHA.

2. Dismissed without prejudice and with leave to amend:

i. ADEA and FEHA claims against the employers;

ii. all deterred applicant claims, to the extent the writers could plead how a particular writer was deterred from applying to a particular employer by that employer's actions; and

iii. aiding and abetting claims under FEHA.

3. Found that plaintiffs should not be certified as a class under the ADEA, and also granted defendants' motions to sever, ruling that all claims of discrimination under the ADEA and FEHA alleging companywide discrimination must be brought against each employer or related group of employers separately.

### 3. *These lawsuits.*

The federal court's order was filed January 24, 2002. On February 25, 2002, the writers filed the 23 class action suits now before this court.[1] As in the federal case, the 23 complaints allege a pattern and practice of discrimination; none pleads the elements necessary to state a prima facie case of discrimination against an individual.

The allegations in each of the 23 lawsuits are generally described in part 1, *ante*. The complaints further allege that the employers have for many years employed, and the talent agencies have contracted to represent, "statistically significant lower numbers of older writers than would be expected absent age discrimination given the relevant qualified applicant pool." These disparities increase with age. The writers assert, for example, that two out of every three nighttime television series did not employ a single writer over the age of 50, and that writers over 50 held 5 percent of the writing positions on episodic comedy series while approximately 33 percent of the WGA membership during the same period was over 50. The complaints allege that top management at the talent agencies have explicitly and implicitly instructed individual agents to seek out, represent and refer younger writers to the exclusion of older writers, and agents have refused to submit older writer clients for television writing opportunities with the networks and studios. The employers, the writers claim, have adopted several employment practices that are facially neutral, but have a disparate impact on older writers: the refusal to accept script submissions except through agents; the use of word of mouth and nepotistic hiring practices including the preselection of younger writers; and the failure to use defined criteria in order to uniformly evaluate the ability of each applicant to write for a particular show or project.

---

[1] On March 1, 2002, the writers filed a notice voluntarily dismissing their remaining federal court claims, and Judge Wilson issued an order authorizing the dismissal on March 6, 2002.

The writers allege that the anecdotal stories and personal experiences described in the complaints have been widely communicated to and among older writers, so that talent agencies and employers alike have developed a well-deserved reputation among older writers for engaging in a pattern or practice of age discrimination. Older writers have been deterred from seeking television writing opportunities from the employers, and representation from the talent agencies for the purpose of obtaining those opportunities, as a result of each employer's and each agency's discriminatory business policies or practices. A few of the writers also generally allege they applied for television writing opportunities and were rejected by the employers, or sought and were refused representation by the talent agencies, but no information is given identifying the position sought, the employer or any other particulars.

The class action allegations of each complaint against the employers define the class as all members of the WGA who were at least 40 years of age and either applied and were rejected, or were deterred from applying, for television writing opportunities with that employer. The complaints state that one or more separate classes, including age-specific subclasses, may be appropriate. The class action allegations of the writers' complaints against the talent agencies are similar.[2]

Based on these allegations, the writers assert causes of action against the employers for violations of FEHA and the Unruh Civil Rights Act. In addition, they allege each employer has aided and abetted the unlawful practices of the talent agencies in violation of the Unruh Civil Rights Act, and the network employers have aided and abetted the unlawful practices of each of the studio employers in violation of FEHA and the Unruh Civil Rights Act. As to the talent agencies, the writers assert causes of action for (a) violation of the Unruh Civil Rights Act, and (b) aiding and abetting the employers' age discrimination in violation of FEHA and the Unruh Civil Rights Act.

### 4. *Demurrers and trial court's January 16, 2003 order.*

Each of the employers and talent agencies demurred to the complaints. After a lengthy hearing, the trial court issued a statement of decision and order, ruling as follows:

---

[2] The class is defined as: "All members of the Writers Guild of America who, at any time since the beginning of the limitations period as determined by the court, were at least age forty, and either applied and were rejected for representation with [the agency] for the purpose of obtaining television writing opportunities, or were deterred from applying for representation with [the agency] for the purpose of obtaining television writing opportunities, including being deterred after prior representation with [the agency] ended."

1. The writers could not state a FEHA class action, because Government Code section 12965, subdivision (b) prohibits a state class action under FEHA if the persons claiming to be aggrieved "have filed" a comparable class action in the federal courts. The demurrers to the class claims were sustained without leave to amend, but without prejudice to the writers' right to plead individual FEHA claims.

2. The FEHA one-year statute of limitations barred the claims of "deterred applicants," that is, claims by writers who did not apply for positions because they were allegedly deterred from applying by the employers' long-standing and continuing discriminatory practices. The court applied principles stated in *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 823 [111 Cal.Rptr.2d 87, 29 P.3d 175], and concluded the statute of limitations began to run when applying for employment first became "a futile, vain gesture." That point appeared, on the face of the complaints, to have occurred more than one year before the complaints were filed. The demurrers to the deterred applicant FEHA claims were sustained, but "with leave specifically to plead individual claims not barred by the applicable statute of limitations."

3. In their federal complaint, the writers alleged statistics "substantially inconsistent with viable deterred applicant claims." As an example, the federal complaint alleged that in the 1997/1998 broadcast season, writers over 40 comprised one-third or more of the writing staffs of most employers. This allegation contradicts the claims of deterred applicants, who generally allege that application would have been a futile gesture. As a result, the demurrers to the deterred applicant FEHA claims were sustained, but "with leave to plead individual claims with facts showing a legal basis for overcoming the federal pleading contradictions sufficient to satisfy" the deterred applicant futility requirements stated in *Teamsters v. United States* (1977) 431 U.S. 324, 366–367 [52 L.Ed.2d 396, 97 S.Ct. 1843] and *Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031 [128 Cal.Rptr.2d 660].

4. To state a prima facie age discrimination claim under FEHA, writers who allege they were actual applicants must specifically aver the identity of the employer, position applied for, and age classification involved in order to provide employers with sufficient notice to permit adequate responsive pleadings. Because the actual applicants did not do so, the employers' demurrers to actual applicant FEHA claims were sustained, with leave to amend.

5. The Unruh Civil Rights Act, which prohibits discrimination by business establishments, does not reach employment discrimination claims, and the complaints "do not allege sales transactions of the sort that qualify for Unruh [Civil Rights] Act treatment." Demurrers to Unruh Civil Rights Act claims

were sustained, with leave to amend to allege business transactions of the kind governed by the Unruh Civil Rights Act.

6. Rulings on the aiding and abetting claims followed those on the underlying substantive violations: demurrers were sustained without leave to amend as to class claims relying on predicate FEHA claims, and with leave to amend for claims relying on predicate Unruh Civil Rights Act violations and individual claims relying on predicate FEHA claims. For the last category, the writers must plead the basic elements of viable aiding and abetting claims, alleging at a minimum the identity of the aider and abettor, knowledge that the primary violator's conduct constituted a breach of duty, and the manner in which the named employer or agency assisted in or encouraged the predicate violation.

7. Writers cannot sue the talent agencies directly for FEHA violations because FEHA did not create direct liability for employment agencies until the passage of amendments effective January 1, 2003.[3] Those amendments constituted a change in the law and do not have retroactive effect.

8. Demurrers on class certification grounds were overruled, and requests for severance were denied, in each case without prejudice; the court indicated its preference to address those issues in the context of amended pleadings. The 23 lawsuits were deemed related, without prejudice to the formulation of a different view in future, and questions relating to consolidation, coordination and joinder were ruled premature.

9. The writers were granted leave to amend their complaints to plead violations of the unfair competition law. (Bus. & Prof. Code, § 17200 et seq.)

### 5. *Proceedings after the January 16, 2003 rulings.*

The trial court's order, filed January 16, 2003, precipitated several actions by the writers. First, they filed second amended complaints, both in the 11 lawsuits against the talent agencies and in the 12 suits against the networks and studios. In the talent agency cases, the writers did not attempt to amend their class claims under the Unruh Civil Rights Act or to assert individual FEHA claims, instead alleging only representative claims (not class claims) under the unfair competition law (UCL). In the employer cases, the writers alleged only

---

[3] The writers did not assert direct FEHA claims against the talent agencies in their complaints, which were filed in February 2002, but raised the issue in their opposition to the demurrers. The trial court observed that the federal court had dismissed the writers' direct FEHA claims against the talent agencies with prejudice, "and that dismissal carries binding effect here."

claims under the UCL, including a class action claim. Second, they filed notices of appeal from the trial court's order in the 11 talent agency lawsuits under the "death knell" doctrine, which permits direct appeal of an order that is tantamount to the death knell of a class action. Third, the writers in the 12 lawsuits against the employers filed a petition for writ of mandate, citing three errors of law they assert require immediate correction: the dismissal of the class claims under FEHA based on the earlier filing of the federal class action; the ruling that deterred applicants' claims were time-barred; and the ruling that individual claims of both actual and deterred applicants must be pled with particularity.

The talent agencies then filed a motion to dismiss the "death knell" appeals, along with a request for judicial notice of several documents, including the second amended complaints filed by the writers on February 28, 2003, and the writers' writ petition in the lawsuits against the employers.[4] We deferred consideration of the talent agencies' motion to dismiss the appeal. With respect to the writ petition, we issued an order to show cause, and advised the parties the writ petition would be heard in conjunction with the appeals in the lawsuits against the talent agencies.[5]

### 6. Trial court's August 14, 2003 order and subsequent proceedings.

Meanwhile, in the trial court, the employers and agencies demurred to the second amended complaints. The employers also filed a motion to stay all proceedings in the trial court pending a decision in the Court of Appeal. On August 14, 2003, the trial court issued a statement of decision with the following principal rulings:

1. Employers' demurrers to the writers' UCL class claims were sustained without leave to amend. The court ruled the writers were not entitled to restitution or disgorgement, or to ancillary monetary relief in conjunction with their request for injunctive relief, under the UCL. Only injunctive relief was available, and that could be obtained through representative actions.

---

[4] The request for judicial notice is granted.

[5] On May 30, 2003, the trial court issued an order granting in part a motion by the writers for certification of four issues under Code of Civil Procedure section 166.1. Section 166.1 allows a judge to indicate in an interlocutory order that "there is a controlling question of law as to which there are substantial grounds for difference of opinion, appellate resolution of which may materially advance the conclusion of the litigation." The trial court granted the motion as to one issue, reframing it as follows: "Whether, in light of California Government Code § 12965[, subdivision](b), a FEHA class action filed originally in federal court can later be re-filed in California state court with different named Plaintiffs without offending § 12965[, subdivision](b)."

2. Employers' demurrers to the writers' UCL representative claims were sustained, but the writers were given leave to amend "to include general allegations showing potential competitive harm or likely consumer deception."

3. Talent agencies' demurrers to the writers' UCL representative actions were sustained, but the writers were given leave to amend "to include allegations generally explaining how Agency Defendant's aided and abetted Employer Defendants' potential competitive harm or likely consumer deception."

The court also granted the employers' motion to stay all matters in their entirety, pending a decision by the Court of Appeal.

After the trial court's August 14, 2003 order, the writers undertook two actions. First, in the 12 lawsuits against the employers, the writers appealed the August 14 order insofar as it finally disposed of all class claims under the UCL (another set of death knell appeals). Second, the writers in one of the 11 lawsuits against the talent agencies (the suit against William Morris Agency) filed a petition for writ of mandate. The petition asks the court to consider whether the trial court erred in holding that a plaintiff is required to allege "potential competitive harm or likely consumer deception" in order to state a claim for relief under the UCL.

This court granted the writers' motion to consolidate the death knell appeals in the 12 employer lawsuits with the earlier writ petitions in those lawsuits, for purposes of briefing, argument and decision. With respect to the writ petition, we issued an order to show cause, and advised the parties that the petition would be considered with the pending appeals and writs.

## DISCUSSION

I. *The order sustaining the talent agencies' demurrers to the writers' class claims under FEHA (without leave to amend) and the Unruh Civil Rights Act (with leave to amend) is appealable under the death knell doctrine.*

■ An order sustaining a demurrer with or without leave to amend is ordinarily not appealable, since the order is not a final judgment. (*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 699 [63 Cal.Rptr. 724, 433 P.2d 732]. An exception to this rule applies in a class action if the legal effect of the

order is "tantamount to a dismissal of the action as to all members of the class other than plaintiff," and if the order "has virtually demolished the action as a class action." (*Ibid.*) California allows direct appeal of such a "death-knell" order as a matter of state law policy. Indeed, some cases state that a plaintiff who fails to appeal a death knell order "loses forever the right to attack it." (*Stephen v. Enterprise Rent-A-Car* (1991) 235 Cal.App.3d 806, 811 [1 Cal.Rptr.2d 130].)

The talent agencies urge dismissal of these appeals, pointing out that the trial court's January 16, 2003 order itself did not entirely dispose of all class-based claims; rather, the order allowed the writers to replead their Unruh Civil Rights Act claims, and to amend their complaints to plead UCL violations. The writers chose not to replead the Unruh Civil Rights Act claims,[6] and likewise chose not to try to plead class claims under the UCL, instead amending their complaints to state only representative claims under the UCL. Because the writers elected not to assert any class claims in their amended complaints, the talent agencies contend it was not the trial court's order that extinguished their class claims; instead it was the writers' own choice that "rang the 'death knell' for their class claims." They argue the writers cannot "kill" their own class claims in order to give this court jurisdiction to hear a death knell appeal.

■ We are persuaded these are proper death knell appeals. The cases illustrate two aspects of a single point. An appeal may be taken if the order in question "has virtually demolished" the action as a class action. (*Daar v. Yellow Cab Co., supra,* 67 Cal.2d at p. 699.) On the other hand, no appeal lies if, after the trial court's order, a viable class claim remains pending in the trial court. That was the case in *Vasquez v. Superior Court* (1971) 4 Cal.3d 800 [94 Cal.Rptr. 796, 484 P.2d 964] (*Vasquez*), upon which the talent agencies rely. *Vasquez* concluded that an order sustaining demurrers to the class action allegations of one cause of action, but overruling demurrers to a second class-based cause of action, was not appealable.[7] (*Id.* at p. 807 & fn. 4.)

*Vasquez,* however, does not settle the point. In *Vasquez,* the second cause of action in the plaintiffs' complaint remained fully viable after the trial

---

[6] As to their Unruh Civil Rights Act claims, the court ruled the act does not reach employment discrimination claims, and allowed amendment only to allege "sales transactions of the sort that qualify for Unruh [Civil Rights] Act treatment."

[7] *Vasquez* also concluded that, because the plaintiffs could not appeal from the order, their writ petition deserved consideration, since the trial court's order barred a substantial portion of their case from being heard on the merits. (*Vasquez, supra,* 4 Cal.3d at p. 807.)

court's order; the demurrers to the plaintiffs' class claim in that cause of action were overruled, not sustained. In this case, by contrast, the trial court's order sustained the demurrers, albeit with leave to amend in one case, and left no class claim pending as originally pled. As *Daar* stated, the order "determine[d] the legal insufficiency of the complaint as a class suit . . . ." (*Daar v. Yellow Cab Co., supra,* 67 Cal.2d at p. 699), at least as originally pled. Thus, the legal effect of the trial court's order was that no class claims remained, absent some further action by the writers, who chose not to attempt to plead sales transactions under the Unruh Civil Rights Act or class claims under the UCL. In short, the trial court's order disposed of all the class claims plaintiffs wanted to bring, allowing them only to try to plead different class claims which, as it happens, they did not want to bring.

 It is plaintiffs, not defendants, who determine the claims to pursue; no principle of law requires plaintiffs to attempt to replead claims or to assert additional class claims that might or might not be available. We see no legitimate basis for depriving the writers of a death knell appeal in circumstances where all the class claims they choose to assert have been eliminated by the trial court's order. Nothing in *Vasquez* or the other cases requires us to consider the trial court's order in a vacuum; the writers' repleading "election" is a direct result of the trial court's order. In this case, the trial court's order was plainly "tantamount to a dismissal" of and "virtually demolished" every class claim that the writers sought to bring.

The talent agencies insist that a death knell appeal may not be "manufacture[d]," and must be struck by the trial court's order, not by plaintiffs' election. The agencies warn that if a death knell appeal is allowed in these circumstances, "litigants could easily circumvent the 'one final judgment' rule and the 'death knell' doctrine by simply re-pleading at any time during the litigation." The agencies do not explain what they mean by this, and we can discern no substance to the argument. Under any circumstances, a plaintiff will have one, and only one, opportunity to appeal an order that has the legal effect of disposing of all class claims. (See *Stephen v. Enterprise Rent-A-Car, supra,* 235 Cal.App.3d at p. 811.) We fail to see any possibility of circumventing the death knell rule.

The motion to dismiss the appeals is denied. We turn next to the issues common to both the appeals in the talent agency cases and the writ petitions in the lawsuits against the employers.

II. *Government Code section 12965, subdivision (b), does not bar the writers who were plaintiffs in Wynn from filing a FEHA class action in state court.*

Government Code section 12965, subdivision (b) (hereafter section 12965(b)) prohibits a state class action under FEHA if the persons claiming to be aggrieved "have filed" a comparable class action in the federal courts. The writers contend, in their appeals in the talent agency suits and in their writ petition in the employer lawsuits, that this provision does not bar their FEHA class action. The only reading of section 12965(b) that is consistent with the remedial purposes of FEHA, they assert, and that does not produce absurd results, is that the provision bars a state class action only when a comparable federal claim is pending. We agree.

Section 12965(b) governs FEHA actions, and states in pertinent part: "Those actions [civil actions under FEHA] may not be filed as class actions or may not be maintained as class actions by the person or persons claiming to be aggrieved where those persons have filed a civil class action in the federal courts alleging a comparable claim of employment discrimination against the same defendant or defendants."

■ Section 12965(b) has not been previously construed, and the parties point to no assistance in its legislative history to guide us. To the extent there is ambiguity, we must follow the statutory mandate to interpret the provision liberally for the accomplishment of FEHA's purposes (Gov. Code, § 12993, subd. (a)), and adhere to established principles of statutory construction, including the avoidance of absurd results. In summary, our conclusion is that the provision is ambiguous, and the Legislature intended to forbid the filing or maintaining of a FEHA class action in state court if a comparable action has been filed and is pending in federal court—that is, duplicative parallel litigation. Obviously, to the extent federal class claims have been adjudicated, principles of res judicata and collateral estoppel will preclude further litigation in state courts. However, we perceive no reason the Legislature would wish to forbid a FEHA class action on issues never adjudicated in federal court. We turn to a point-by-point analysis.

A. *The statutory language is ambiguous.*

Both the employers and the talent agencies contend the statute is clear: it bars a state FEHA class action where the persons claiming to be aggrieved "have filed" a class action in the federal courts alleging a comparable claim

of employment discrimination against the same defendants. The trial court found this "plain language" contrary to the writers' claim that the statute forbids only concurrent class actions; the court indicated that "have filed" is the "past tense" and that the statute plainly intends to impose a bar on successive class actions.

We do not agree that "have filed" is the past tense or that the language is unambiguous.[8] In fact, "have filed" is the present perfect tense, a tense which indicates either that an action was completed at some point in the past (arguably supporting the trial court's construction) or that the action began in the past and continues up to and including the present.[9] The latter alternative comports with the view that class claims in state court are prohibited only where a federal class action is ongoing. Accordingly, we are unwilling to conclude, without more, that the Legislature's use of the words "have filed" necessarily means that any past filing of a federal class action, regardless of its procedural or substantive status or consequences, bars any subsequent FEHA class action in state court. We therefore turn to the question of legislative purpose and intent to find the proper construction of the provision.

> B. *Policies underlying FEHA, as well as the principle that statutes should be interpreted to avoid absurd consequences, support the conclusion that section 12965(b) bars only concurrent federal and state class actions.*

The employers[10] state that the statute prohibits successive class suits, because class actions are expensive to litigate and consume substantial

---

[8] The writers have a different "plain language" argument, which we also reject. They contend that, even if section 12965(b) bars the *Wynn* plaintiffs from filing a successive class action in state court, writers who did not participate in *Wynn*—by far the majority of the writers bringing these suits—may bring their class claims in state court. The writers base this notion on the statutory language: FEHA class claims may not be brought "by the person or persons claiming to be aggrieved" where "those persons" have filed a comparable class action in the federal courts. The writers assert this means that only the named plaintiffs in *Wynn* would be barred from bringing class claims in state court. That construction, however, would render section 12965(b) meaningless. It would allow identical class claims to be filed concurrently in federal and state courts—a circumstance the Legislature clearly intended to prevent—by the simple device of having different named plaintiffs in each suit. This is an absurd consequence that the Legislature could not have intended. We conclude that, where the prospective class is the same, the identity of the named plaintiffs does not affect the question whether a FEHA class action in state court is, or is not, barred by section 12965(b).

[9] See, for example, Wilson, The Columbia Guide to Standard American English (1993) <http://www.bartleby.com/68/50/4750.html> (as of Aug. 4, 2004).

[10] On this point, the talent agencies confine themselves to the argument that the statutory language is unambiguous and that any other arguments are irrelevant.

judicial resources, and the statute was designed to prevent forum shopping. They cite, however, no legislative history supporting these statements.[11]

Certainly class actions consume substantial judicial resources, and the prevention of forum shopping is a worthy objective. The fact of the matter is, however, that there is no indication of the Legislature's intention when it forbade the filing of FEHA class claims in circumstances where plaintiffs "have filed" comparable class claims in federal courts.[12] We have no reason

---

[11] The employers offer a single page from the legislative history. This is a Senate Democratic Caucus report that refers to an increase in the number of complaints to the Fair Employment Practices Commission (FEPC); it nowhere refers to judicial resources, and refers to the class action provision of the bill only in its description of the legislation. Our own review found only one tangential reference to judicial resources, and that appeared in the Department of Finance's report on the enrolled bill. The analysis of the fiscal effect of the bill included the following: "FEPC believes that few complainants would use the option of bringing civil action in a superior court. Such action would be time-consuming and costly if the complainant loses. The vast majority of complainants would probably wait for FEPC investigation of their complaint and then accept the FEPC decision. The bill would, however, create some additional caseload for the court system to absorb and would relieve FEPC of a small portion of caseload backlogged over 150 days." (Cal. Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 738 (1977–1978 Reg. Sess.) Sept. 25, 1977, p. 3.)

[12] Our review of the legislative history reveals the following information. The class action provision was included in Senate amendments to a 1977 bill (Assem. Bill No. 738 (1977–1978 Reg. Sess.) as introduced by Assembly Member Lockyer Mar. 3, 1977) which restructured the FEPC to provide a different distribution of functions between the FEPC and the Division of Fair Employment Practices of the Department of Industrial Relations (Division). The legislative history shows:

1. Assembly Bill No. 738 was an attempt to remedy a situation in which the organization of the FEPC was "totally inadequate" for the timely processing of the hundreds of discrimination complaints received.

2. As passed by the Assembly, the bill empowered the Division to investigate, conciliate and prosecute all complaints alleging discriminatory practices; provided for an administrative hearing officer system within the FEPC to hear accusations filed by the Division; provided that the hearing officer's decision be confirmed or set aside by the FEPC; and allowed the Division to initiate class action suits against discriminatory practices and seek temporary restraining orders to protect aggrieved parties in certain instances.

3. The Senate amendments eliminated the provisions for an administrative hearing officer system and for action by the FEPC on the decisions of hearing officers. According to the Digest of the Assembly Office of Research, those amendments also provided that "the division cannot initiate class action suits if the aggrieved persons have filed a similar suit in a federal court." (Assem. Office of Research, Unfinished Business, Assem. Conc. in Sen. Amends. Digest, Assem. Bill No. 738, as amended Sept. 12, 1977, p. 1.)

4. The provision specifying that civil actions may not be filed as class actions by persons claiming to be aggrieved, where those persons have filed a civil class action in the federal courts, was added in the Senate on August 17, 1977. After additional Senate amendments on September 2 and 12, 1977, the measure was passed on September 15, 1977. The available documents offer no rationale for the amendment. The bill was enrolled on September 19, 1977.

5. The analysis in the Enrolled Bill Report of the Department of Industrial Relations states that: "The Chief [of the Division] or her authorized representative may file a complaint on her or his own initiative. Class action authority is specified. However, a class action in the courts

to suppose the Legislature intended anything more than to conserve judicial resources by prohibiting FEHA class claims where, for example, plaintiffs are already pursuing comparable Title VII class claims under the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) in federal court.[13]

Since we do not know, from any documentary evidence, the legislative intent in enacting the class action provision of section 12965(b), we turn to what we do know. We know that the Legislature mandated that every provision of FEHA be construed liberally for the accomplishment of FEHA's purposes. (Gov. Code, § 12993, subd. (a).) We know that the elimination of age and other invidious bases for discrimination in employment is the public policy of this state. (*Id.*, § 12920.) We know that it is the purpose of FEHA "to provide effective remedies that will eliminate . . ." discriminatory practices. (*Ibid.*)

In light of these clear legislative mandates, we will not adopt a more restrictive reading of section 12965(b) than its words require. The employers have offered no persuasive reason to conclude the Legislature meant to forbid successive, rather than concurrent, class actions.[14] Moreover, reading the

---

may not be filed if the complainant has already filed a class action in federal court alleging a comparable claim against the same defendant." (Cal. Dept. of Industrial Relations, Enrolled Bill Rep. on Assem. Bill No. 738 (1977–1978 Reg. Sess.) Sept. 21, 1977, p. 1.)

6. The findings in the Enrolled Bill Report of the Department of Finance state that: "The bill further provides that if a party has brought suit (civil class-action) in the Federal courts alleging a comparable claim of employment discrimination against the same defendant(s), they may not also sue in the superior courts." (Cal. Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 738, *supra*, p. 2.)

7. Assembly Member Lockyer's letter urging the Governor to approve the legislation describes the bill as follows: "Specifically, the measure would empower the Division to receive, investigate, and attempt to conciliate complaints. Failing conciliation, the Division would prosecute cases before the Commission [FEPC]. Strict time limits are imposed on the disposition of complaints; should the Division fail to resolve a complaint within the specified time, the complainant would have the right of private civil action. The bill also permits the filing of class action complaints for the purpose of eliminating industry-wide discriminatory practices." (Assembly Member Lockyer letter to Governor Edmund G. Brown, Jr. re Assem. Bill No. 738 (1977–1978 Reg. Sess.) Sept. 23, 1977.)

8. The bill was signed by the Governor on September 30, 1977.

[13] Only one other case has interpreted the class action provision of section 12965(b). (*Stender v. Lucky Stores, Inc.* (N.D.Cal. 1991) 766 F.Supp. 830. *Stender* held that section 12965(b) does not preclude the filing of pendant FEHA claims in a federal class action alleging race and sex discrimination. We agree with the employers that *Stender* did not address the question before this court, and is not of particular assistance to our analysis. *Stender*, however, does assume the same reading of section 12965(b) that we adopt; the court notes the general principle that Government Code section 12965 "preclude[s] parallel state and federal court class actions" (766 F.Supp. at p. 832), and refers to the provision as "prohibiting the filing of a FEHA class action where comparable non-FEHA class claims are pending in federal court . . . ." (*Ibid.*)

[14] The employers claim section 12965(b) would be "practically useless" if it prevents only concurrent class actions. They assert plaintiffs would be able to file a duplicative class action suit in state court "as soon as a federal court entered an order denying class certification

statute as the employers suggest, to mean that a class action filing in federal court by any member of the plaintiff class bars any subsequent class claim in state court, under any circumstances, would have consequences that cannot have been intended. (See *In re J.W.* (2002) 29 Cal.4th 200, 210 [126 Cal.Rptr.2d 897, 57 P.3d 363] [courts will not give statutory language a literal meaning if doing so would result in absurd consequences that the Legislature could not have intended].) As amici curiae point out, any number of procedural errors in a federal court filing could prompt the dismissal of the federal action, long before class certification questions or the merits of the litigation are ever reached. If such a filing bars a subsequent class suit in state court, meritorious class claims could go unheard.[15] We cannot conclude that the Legislature, whose stated objective was to provide effective remedies for the elimination of discriminatory practices (Gov. Code, § 12920), could have intended such a result.

We are cognizant of the fact that our interpretation of section 12965(b) effectively requires some duplication of judicial effort where successive class suits are filed. However, it does not, as the employers argue, give the writers, or anyone else, "a second bite at the class action apple in state court . . . ." The writers have not yet had their first bite at the class action apple so far as FEHA is concerned. Indeed, in the course of its adverse ruling on class action status under the ADEA,[16] the *Wynn* court indicated that had the writers brought a class action against any one employer, under a pattern or practice claim against that particular employer, "the class would most likely be

---

because the federal class action would no longer be pending." We see no need to address hypothetical and implausible scenarios, the ramifications of which are highly speculative. Suffice it to say that a prohibition on concurrent class actions is not "practically useless." A final decision on the merits in a federal class claim will bar a plaintiff from pursuing a comparable claim in state courts under res judicata doctrine. (See *Johnson v. American Airlines, Inc.* (1984) 157 Cal.App.3d 427 [203 Cal.Rptr. 638].) Indeed, in this case all claims the federal court dismissed with prejudice are, as the writers concede, decisions on the merits that cannot be further pursued.

[15] The employers point out that construing section 12965(b) to prohibit successive class claims would not affect individual FEHA claims, and that is true. However, the importance of the class action as a device to remedy systemic discrimination seems obvious, and we are not persuaded that "sound policy" supports a restriction on its use unless the legislative intent in that regard is clear.

The employers also cite a False Claims Act provision in which the Legislature used the word "pending" in providing that, when one person brings an action, no other person may bring a related action based on the facts underlying the pending claim. (Gov. Code, § 12652, subd. (c)(10).) That statute was passed some seven years after the enactment of FEHA, does not address lawsuits brought by the same person, does not address class actions, and sheds no light on the Legislature's intent in the entirely different context of section 12965(b).

[16] The ADEA incorporates certain "opt-in" provisions of the Fair Labor Standards Act, and rule 23 of the Federal Rules of Civil Procedure does not apply to ADEA claims. The court, in light of its ruling on the ADEA class action, indicated it would not address the issue of class certification of state law claims under rule 23 "at this time." (*Wynn, supra,* 234 F.Supp.2d at p. 1081 & fn. 8.)

conditionally certified at this point, or at some point later in the proceedings."[17] (*Wynn, supra*, 234 F.Supp.2d at p. 1084.) In short, much remained to be done, whether in federal or state court, and the employers' claim that our interpretation of the statute allowing it to be done in state court "runs counter to sound judicial administration" is considerably overblown.[18]

■ In sum, we conclude that the statutory proscription on filing or maintaining a FEHA class action in state court, when the same persons "have filed" a class action in federal court alleging a comparable claim, was intended to proscribe concurrent, not successive, class actions. Our conclusion on this point eliminates any need to address the writers' contentions that class relief in state court is available because the alleged FEHA violations are ongoing, or that construing section 12965(b) to prohibit a class action in state court on claims that were voluntarily dismissed under rule 41(a) of the Federal Rule of Civil Procedure (28 U.S.C.) would violate the supremacy clause.[19]

We turn next to the matter of the statute of limitations.

> *III. FEHA's one-year statute of limitations does not bar the claims of "deterred applicants," that is, writers who allege they did not apply for positions because of an entrenched policy of discrimination.*

The writers contend the trial court erred in concluding that the one-year FEHA statute of limitations barred the claims of nonapplicants or "deterred applicants," those who did not apply for positions during the statutory period because of an allegedly long-entrenched policy of discrimination against older writers. We agree with the writers.

The fundamental issue to be decided is whether FEHA's one-year statute of limitations prevents nonapplicant writers (deterred applicants) from prosecuting a claim that, within the statutory period, employers and agencies enforced a systemic policy of age discrimination that deterred the writers

---

[17] In *Wynn*, the writers brought a single suit against the entire industry, and the court granted the defendants' motion to sever, requiring the writers to bring their claims against each related group of employers separately.

[18] While the state court will necessarily consider "virtually identical allegations," it will not decide issues already decided by the federal court. It will decide matters as to which the federal court granted the writers leave to amend, in addition to other state claims not raised in federal court.

[19] The writers argue a voluntary dismissal under rule 41(a) of the Federal Rules of Civil Procedure (28 U.S.C.) leaves the parties, in legal effect, as though the federal class claims had never been brought, and consequently section 12965(b) cannot be construed, consistent with the supremacy clause, to forbid a subsequent suit on those claims in state court.

from applying for positions as television screenwriters.[20] The answer depends upon whether a principle announced in *Richards v. CH2M Hill, Inc., supra,* 26 Cal.4th 798 (*Richards*) applies. *Richards* involved an application of the continuing violation doctrine. *Richards* decided that the statute of limitations in disability harassment cases involving an employer's series of unlawful actions against an employee begins to run when the employee is on notice that further efforts to end his employer's unlawful conduct will be futile. If the *Richards* futility formulation also applies to cases of an ongoing corporate policy of discrimination against a protected class, the writers' complaints themselves tend to show that the statute of limitations ran long ago on most claims by deterred applicants, because the complaints generally allege that the discriminatory policies in question have been entrenched for many years.

We conclude the *Richards* formulation does not apply. We first describe the continuing violation doctrine, then discuss its application as mandated by *Richards*, and finally explain the reason the doctrine does not apply in the cases under review.

### A. *Continuing violation doctrine.*

We begin by agreeing, as did *Richards*, with the observation that the continuing violation doctrine is " 'arguably the most muddled area in all of employment discrimination law.' " (*Richards, supra,* 26 Cal.4th at p. 813, quoting 2 Lindemann & Grossman, Employment Discrimination Law (3d ed. 1996) p. 1351.) The continuing violation doctrine is muddled because, as *Richards* points out, it "refers not to a single theory, but to a number of different approaches, in different contexts and using a variety of formulations, to extending the statute of limitations in employment discrimination cases." (*Richards, supra,* 26 Cal.4th at p. 813.)

Both federal and earlier California cases have distinguished two different types of continuing violations, both of which also are identified in *Richards*. One is a systematic corporate policy of discrimination, and the other is a series of discriminatory acts directed at an individual. (See, e.g., *Morgan v. The Regents of the University of California* (2000) 88 Cal.App.4th 52, 64 [105 Cal.Rptr.2d 652] [a continuing violation may be established by demonstrating either a companywide policy or practice or a series of related acts against a single individual]; *Bullington v. United Air Lines, Inc.* (10th Cir. 1999) 186 F.3d 1301, 1311 ["a continuing violation may be based on either a series of related acts taken against a single individual or the maintenance of a company-wide policy or practice of discrimination"]; *Sabree v. United Broth.*

---

[20] Some of the employers contend we need not reach the statute of limitations question, because the writers' claim alleging a pattern and practice of discrimination is not authorized under FEHA. We consider that contention along with other pleading issues in part IV, *post.*

*of Carpenters and Joiners* (1st Cir. 1990) 921 F.2d 396, 400 & fn. 7 [distinguishing serial and systemic continuing violations; a "systemic violation has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitation period, a challenger may be deemed to have filed a timely complaint"].) Commentators have drawn a similar distinction.[21]

*Richards* examined federal case law on continuing violations and identified "essentially four approaches" used in federal cases. The first involves a systematic corporate policy of discrimination which was initiated before the limitations period, but continues in effect within that period to the detriment of the employee. (*Richards, supra*, 26 Cal.4th at p. 813.) For example, a discriminatory promotions policy, implemented long before suit is brought, is actionable if it continues into the limitations period to wrongfully deny an employee a promotion. *Richards* cited California cases similarly concluding that a policy of systematic discrimination in promotions constitutes a continuing violation. (*Richards, supra*, 26 Cal.4th at p. 813, citing *Valdez v. City of Los Angeles* (1991) 231 Cal.App.3d 1043, 1052–1054 [282 Cal.Rptr. 726] (*Valdez*), and *City and County of San Francisco v. Fair Employment & Housing Com.* (1987) 191 Cal.App.3d 976, 983 [236 Cal.Rptr. 716] (*City and County of San Francisco*).) It is this type of "continuing violation"—a systematic, companywide corporate policy of discrimination against a protected class—that is alleged in the cases under review.

*Richards* identified three other approaches, all of them used in cases involving an entirely different context: a series of discriminatory acts directed at an individual, rather than a systematic corporate policy of discrimination. In one approach, a series of discriminatory acts may delay the deadline for suing with respect to earlier acts in the series, only if the character of the earlier acts was not apparent when they were committed, but became apparent in light of later acts committed during the limitations period.[22] (*Richards, supra*, 26 Cal.4th at pp. 813–814.) Another approach is the multi-factored approach first described in *Berry v. Board of Sup'rs of L.S.U.* (5th Cir. 1983) 715 F.2d 971 (*Berry*), to determine when a number of discriminatory acts are related closely enough to constitute a continuing

---

[21] "The term 'continuing violation' generally is used to refer to a defendant's alleged maintenance over time of a discriminatory policy or system. Sometimes the term is used to refer to a series of acts that, while perhaps different in kind, are alleged to constitute a related course of conduct." (2 Lindemann & Grossman, Employment Discrimination Law, *supra*, p. 1351.)

[22] This approach is derived from the doctrine of equitable tolling, where the person injured need not sue until he knows, or should know, both that he has been injured and that he has been injured by a possibly wrongful act of the employer. (*Richards, supra*, 26 Cal.4th at pp. 813–814, citing *Moskowitz v. Trustees of Purdue University* (7th Cir. 1993) 5 F.3d 279, 281–282.)

violation, and when they are merely discrete acts which must be regarded as individual violations. The three nonexclusive factors identified in *Berry* were whether the acts involve the same type of discrimination, whether the acts are frequent, and whether the acts have a degree of permanence that would trigger an employee's awareness that his or her rights have been violated. (*Richards, supra,* 26 Cal.4th at p. 814, discussing *Berry, supra,* 715 F.2d at p. 981.) The final approach is a broader "course of conduct" approach. That approach dispenses with the *Berry* permanence factor and examines whether the separate acts of discrimination are so closely related as to form a continuing violation. (*Richards, supra,* 26 Cal.4th at p. 816.)[23] After reviewing these approaches to the continuing violation doctrine, *Richards* adopted a modified version of the *Berry* approach for application to a case involving an employer's series of unlawful actions in failing to reasonably accommodate an employee's disability.

The *Richards* review of the continuing violation doctrine crystallizes one critical point. The cases under review by this court are analogous only to the first category of continuing violations identified in *Richards* and other authorities; the writers allege a systematic corporate policy of discrimination against a protected class that was enforced during the limitations period, to the detriment of members of the class during that period. No relief is sought for employer conduct predating the limitations period. By contrast, the other three approaches involve an entirely different category of continuing violation. Those three approaches were used by the courts to determine whether a series of discriminatory acts against an individual constitute a continuing violation, such that acts outside the statute of limitations may be used to establish the employer's liability.

■ The two categories of so-called continuing violations are thus fundamentally different. The first seeks relief for discrimination during the limitations period, and the second seeks to impose liability for acts outside the limitations period. The first seeks relief for pervasive companywide discrimination against a protected class, and the second involves a series of discriminatory acts, in most cases targeting a single individual.[24]

---

[23] According to *Richards,* the "course of conduct" test is exemplified by Ninth Circuit decisions such as *Anderson v. Reno* (9th Cir. 1999) 190 F.3d 930, 936–937 (pattern of sexual harassment found to be sufficiently related). (*Richards, supra,* 26 Cal.4th at p. 816.)

[24] One case involved a group of firefighters who challenged, under the Fair Labor Standards Act (FLSA), a reduction in pay that took place more than three years before they made the claim (and thus outside the three-year statute of limitations for FLSA cases). The court rejected the notion that the violation was renewed with each paycheck, concluding a neutral practice which gives effect to prior discrimination is not a continuing violation. (*Hendrix v. City of Yazoo City, Miss.* (5th Cir. 1990) 911 F.2d 1102, 1104–1105.)

The *Richards* case, upon which the trial court relied to find the claims of deterred applicants time-barred, is clearly addressed to the second category of continuing violations: a series of discriminatory acts targeting an individual victim, specifically, refusing reasonable accommodation to a disabled individual. Our examination of *Richards* compels the conclusion that the principles announced there have no application to the cases before us. We turn to the holdings of the *Richards* case to illustrate the point.

### B. *Richards v. CH2M Hill, Inc.*

■ As *Richards* explains, "the continuing violation doctrine comes into play when an employee raises a claim based on conduct that occurred in part outside the limitations period." (*Richards, supra,* 26 Cal.4th at p. 812.) Specifically, the question posed by *Richards* was this: "Is an employer liable for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct within the limitations period?" (*Ibid.*) In *Richards,* "[m]any of the incidents of disability discrimination introduced at trial occurred outside the one-year limitations period" for filing FEHA actions. (*Id.* at pp. 801–802.) Adopting a modified version of the *Berry* test, the Supreme Court held: "We conclude, consistent with the language and purposes of the FEHA, as well as federal and California case law, that an employer's series of unlawful actions in a case of failure to reasonably accommodate an employee's disability, or disability harassment, should be viewed as a single, actionable course of conduct if (1) the actions are sufficiently similar in kind; (2) they occur with sufficient frequency; and (3) they have not acquired a degree of 'permanence' so that employees are on notice that further efforts at informal conciliation with the employer to obtain accommodation or end harassment would be futile." (*Richards, supra,* 26 Cal.4th at p. 802.)[25]

The court expressly addressed the statute of limitations: "Thus, when an employer engages in a continuing course of unlawful conduct under the FEHA by refusing reasonable accommodation of a disabled employee or

---

[25] The court elaborated, later in its opinion: "As in *Berry,* we hold that an employer's persistent failure to reasonably accommodate a disability, or to eliminate a hostile work environment targeting a disabled employee, is a continuing violation if the employer's unlawful actions are (1) sufficiently similar in kind—recognizing, as this case illustrates, that similar kinds of unlawful employer conduct, such as acts of harassment or failures to reasonably accommodate disability, may take a number of different forms [citation]; (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence. [Citation.] But consistent with our case law and with the statutory objectives of the FEHA, we further hold that 'permanence' in the context of an ongoing process of accommodation of disability, or ongoing disability harassment, should properly be understood to mean the following: that an employer's statements and actions make clear to a reasonable employee that any further efforts at informal conciliation to obtain reasonable accommodation or end harassment will be futile." (*Richards, supra,* 26 Cal.4th at p. 823.)

engaging in disability harassment, and this course of conduct does not constitute a constructive discharge, the statute of limitations begins to run, not necessarily when the employee first believes that his or her rights may have been violated, but rather, *either* when the course of conduct is brought to an end, as by the employer's cessation of such conduct or by the employee's resignation, *or* when the employee is on notice that further efforts to end the unlawful conduct will be in vain." (*Richards, supra*, 26 Cal.4th at p. 823.)[26]

The employers seize upon the final factor in the court's test—whether the victim is on notice that further efforts to end unlawful conduct will be futile—and assert that it applies to start the statute of limitations in every case of ongoing discrimination, including a companywide policy of discrimination against a class. We conclude, to the contrary, that it is manifest from *Richards* that the principles announced there have no application to the cases before us.

C. *The Richards doctrine has no application to a claim of ongoing, companywide, systematic discrimination against a protected class.*

We begin by noting the contrasts between *Richards* and the cases under review. In these cases, the question is not, as it was in *Richards*, the employer's liability "for actions that take place outside the limitations period . . . ." (*Richards, supra*, 26 Cal.4th at p. 812.) The question is the employer's liability for enforcing a discriminatory policy during the limitations period. The employers and the agencies are not liable—and the writers do not claim they are—for discrimination in hiring that occurred more than one year before the complaints in these cases were filed with the Department of Fair Employment and Housing.[27] As already mentioned, another difference is equally apparent: these cases allege systematic, companywide discrimination against a class of persons, and *Richards* involved a series of discriminatory acts directed at an individual.

Nonetheless, the employers insist that *Richards* established, for all cases in which discrimination could be described as a continuing course of conduct,

---

[26] The court continued: "Accordingly, an employer who is confronted with an employee seeking accommodation of disability or relief from disability harassment may assert control over its legal relationship with the employee either by accommodating the employee's requests, or by making clear to the employee in a definitive manner that it will not be granting any such requests, thereby commencing the running of the statute of limitations." (*Richards, supra*, 26 Cal.4th at pp. 823–824.)

[27] The complaints describe the class as all members of the WGA "who, at any time since the beginning of the limitations period as determined by the court," were at least 40 years old "and either applied and were rejected" for representation or employment "or were deterred from applying" for representation or employment.

that the statute of limitations begins to run "when a plaintiff first learns that it would be 'futile' to change the situation . . . ." The agencies similarly argue that *Richards* applies " [b]y its own terms, . . .regardless whether a plaintiff alleges a 'pattern-or-practice' of discrimination against a class or merely an ongoing course of discrimination against an individual." We are compelled to disagree.

First, *Richards* certainly does not apply "[b]y its own terms." *Richards* nowhere addresses the application of the continuing violation doctrine to allegations of ongoing systematic discrimination against a class. To the contrary, *Richards* repeatedly confines its holding to the circumstances under review, expressly addressing only "the applicability of the continuing violation doctrine to the FEHA when an employer fails to reasonably accommodate a disability or to prevent disability discrimination." (*Richards, supra,* 26 Cal.4th at pp. 818, 823 [defining " 'permanence' in the context of an ongoing process of accommodation of disability, or ongoing disability harassment"].) Indeed, *Richards* is explicitly premised on the rationale that the limitations period should not begin to run, in such a case, at the first notice that an employee's rights have been violated, because that would "short-circuit the reasonable accommodation process . . . ." (*Id.* at p. 822.) Its holding was expressly based on the existence and importance of the informal conciliation and accommodation process.[28] (*Id.* at pp. 821–822.) The concept of informal conciliation is, of course, completely inapplicable when no employment relationship, and hence no opportunity for informal conciliation, exists. In short, nothing in *Richards* suggests that its formulation applies, or was intended to apply, to classwide claims of an ongoing, companywide, systematic policy of age discrimination in hiring. And, it is hornbook law that " 'an opinion is not authority for a proposition not therein considered.' " (*Richmond v. Shasta Community Services Dist.* (2004) 32 Cal.4th 409, 422 [9

---

[28] *Cucuzza v. City of Santa Clara, supra,* 104 Cal.App.4th 1031 (*Cucuzza*) explained the *Richards* formulation as follows: "*Richards* explained that in the context of reasonable accommodation, the statute of limitations should not be interpreted in a way that would short-circuit an ongoing accommodation process. [Citation.] If the employer's actions were sufficiently similar and reasonably frequent the actions will be deemed a continuing course of conduct rather than separate acts of misconduct, and the statute of limitations would not bar an offending employer's liability for even its earliest failure to accommodate. The court acknowledged, however, that it would be less than fair to the employer to allow the employee to extend the limitations period indefinitely. Therefore, *Richards* included the third prong, which sets an outside limit on the length of time a course of conduct may continue before it will be barred. [¶] *Richards* determined that a lack of permanence should be one of the factors necessary to apply the continuing violation doctrine in order to fairly balance the employee's interest in resolving the dispute with the employer's interest in preventing indefinite delays. [Citation.] The court explained that if the statute were to accrue when the first incident occurred, the pressure to file a lawsuit before the statute expired could easily inhibit meaningful efforts at conciliation. But when the situation reached a state of permanence, then the plaintiff no longer has any reason to delay filing." (*Cucuzza, supra,* 104 Cal.App.4th at pp. 1041–1042.)

Cal.Rptr.3d 121, 83 P.3d 518], quoting *Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].)

Second, some of the employers urge that the issue in *Richards* was when the unlawful practice "occurred,"[29] and that *Richards* "tied its analysis to FEHA's language indicating that the limitation period is triggered when an 'unlawful practice' has 'occurred.' " The employers' statement is true, but the analysis underlying it is incomplete. *Richards* did not purport to opine when an unlawful practice has "occurred" for any and every kind of unlawful practice. *Richards*'s holding and analysis is very plainly addressed only to the question when an employer's persistent failure to reasonably accommodate an individual employee's disability, "or to eliminate a hostile work environment targeting a disabled employee," is a continuing violation. (*Richards, supra,* 26 Cal.4th at p. 823.) *Richards* neither discussed nor decided when an employer's ongoing pattern or practice of systematic discrimination against a protected class has "occurred" for purposes of the statute of limitations. Moreover, federal precedent confirms that the question of timely filing with respect to pattern and practice claims by private litigants is entirely distinct from limitations questions in contexts such as that in *Richards*. Thus, in *National Railroad Passenger Corporation v. Morgan* (2002) 536 U.S. 101, 105 [153 L.Ed.2d 106, 122 S.Ct. 2061] (*Amtrak*), the Supreme Court resolved, under federal law, the question whether, and under what circumstances, a Title VII plaintiff may file suit on events that fall outside the limitations period.[30] In doing so, the court expressly noted it had "no occasion here to consider the timely filing question with respect to 'pattern-or-practice' claims brought by private litigants . . . ." (*Id.* at p. 115, fn. 9.)

▮ Third, the *Richards* test itself shows its inapplicability to claims of a companywide pattern or practice of unlawful discrimination. The very

---

[29] Government Code section 12960, subdivision (d), provides: "No complaint may be filed [with the Department of Fair Employment and Housing] after the expiration of one year from the date upon which the alleged unlawful practice . . . occurred . . . ."

[30] *Amtrak* considered both discrete discriminatory acts—such as termination, failure to promote, denial of transfer, or refusal to hire (*Amtrak, supra,* 536 U.S. at p. 114)—and hostile work environment claims, which are "different in kind" from discrete acts, their "very nature involv[ing] repeated conduct." (*Id.* at p. 115.) As to discrete discriminatory acts, the Supreme Court stated: "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. . . . The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim." (*Id.* at p. 113.) As to hostile environment claims, the Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period." (*Id.* at p. 105.)

purpose of the *Richards* test is to determine whether "an employer's series of unlawful actions . . . should be viewed as a single, actionable course of conduct . . . ," subjecting the employer to liability for acts outside the limitations period.[31] (*Richards, supra,* 26 Cal.4th at p. 802.) However, in pattern and practice cases, no test is necessary to determine whether unlawful actions outside the limitations period should be viewed as part of a single, actionable course of conduct, because no relief is sought for actions outside the limitations period. Relief is sought only for enforcement of the discriminatory policy during the limitations period. Moreover, the three prongs of the *Richards* test—whether the employer's actions are sufficiently similar in kind, occur with sufficient frequency, and have not acquired a degree of permanence such that further efforts at informal conciliation would be futile—likewise show the test's irrelevance to claims of ongoing systematic discrimination in hiring. In a pattern and practice case, the employer's unlawful actions are, by definition, identical in kind and pervasive in frequency. The question of "permanence" similarly does not arise, because no relief is sought for actions outside the limitations period, and the *raison d'être* for the permanence requirement is to allow an ongoing process of reasonable accommodation between employer and employee to occur. (*Richards, supra,* 26 Cal.4th at pp. 820–823.) In short, the *Richards* test does not address, and plainly was not intended to address, the question when the statute of limitations begins to run on a pattern and practice claim of systematic discrimination.

██ In sum, the *Richards* test is entirely inapposite to a case of continuing systemic discrimination against a class. The rationale stated in *Valdez* and *City and County of San Francisco*, on the other hand, remains fully viable. *Valdez* and *City and County of San Francisco*, as well as many federal cases, have concluded that a continuing violation may be found when a corporate policy is initiated before the limitations period, but continues in effect within that period to the detriment of the employee. (*Valdez, supra,* 231 Cal.App.3d at pp. 1052, 1054 [critical question is whether any present violation exists; a present violation existed "because the employer, during the limitations period, [was] making promotions from a list tainted by discrimination"]; *City and County of San Francisco, supra,* 191 Cal.App.3d at p. 983 [because promotions continued to be made from an allegedly discriminatory

---

[31] The employers also cite *Cucuzza, supra,* 104 Cal.App.4th 1031, decided after *Richards*, in support of their position. In *Cucuzza*, the court rejected the plaintiff's claim that the city's ongoing denial of her right to certain employment opportunities was a continuing violation of FEHA. *Cucuzza* adds nothing to *Richards*, and indeed emphasizes exactly what *Richards* decided: "The issue in either case [*Cucuzza* and *Richards*] is the same: whether the employer's conduct occurring outside the limitations period is sufficiently linked to unlawful conduct within the limitations period that the employer ought to be held liable for all of it." (*Cucuzza, supra,* 104 Cal.App.4th at p. 1042.) In the cases under review, the writers do not seek to hold the employer liable for actions occurring outside the limitations period.

eligibility list (adopted outside the statutory period) during the year preceding the filing of the complaint, the complaint was timely filed]; *Williams v. Owens-Illinois, Inc.* (9th Cir. 1982) 665 F.2d 918, 924 ["the relevant strain of continuing violation doctrine is that a systematic policy of discrimination is actionable even if some or all of the events evidencing its inception occurred prior to the limitations period"]; see *Richards, supra,* 26 Cal.4th at p. 813.)

The employers assert that *Richards* implicitly overruled *Valdez* and *City and County of San Francisco,* and "expressly rejected" the approach used in those cases. The employers do not specify where in *Richards* this express rejection may be found, and with good reason: it is not there. *Richards* nowhere suggests or implies that *Valdez* and *City and County of San Francisco* were wrongly decided. Further, for the reasons we have discussed, it is improbable that the Supreme Court would apply the *Richards* formulation to the entirely different circumstances that existed in *Valdez* and *City and County of San Francisco,* where policies of systematic discrimination in promotions existed and were applied during the limitations period to the detriment of the employee. Nothing in *Richards* suggests that is or should be the law.[32]

Finally, the employers cite *Richards* and *Cucuzza* for the proposition that it would be unfair to the employer to allow the employee to extend the limitations period indefinitely. The argument merely demonstrates the inappositeness of *Richards* to a case of companywide systematic discrimination against a class. The court's concern in *Richards* about permitting an employee to indefinitely delay the filing of a lawsuit was expressly connected to cases of harassment of or failure to accommodate a disabled employee. (*Richards, supra,* 26 Cal.4th at pp. 822–823.) The court explained that when an employee's hope that conditions will improve is unreasonable, justification for delay in taking formal legal action no longer exists. "If the employer has

---

[32] The employers contend that the Ninth Circuit has ruled that allegations of a pattern or practice of discrimination do not extend the statute of limitations under federal law, citing *Cherosky v. Henderson* (9th Cir. 2003) 330 F.3d 1243. The employers misconstrue *Cherosky,* which explicitly stated that the "individualized decisions" that were at the heart of the employees' complaint were "best characterized as discrete acts, rather than as a pattern or practice of discrimination." (*Id.* at p. 1247.) Indeed, the *Cherosky* court was at pains to distinguish pattern or practice claims, which it pointed out "must be based on discriminatory conduct that is widespread throughout a company or that is a routine and regular part of the workplace." (*Ibid.*) Moreover, the court's holding was that the employees could not challenge conduct that occurred prior to the limitations period merely by alleging that the conduct was undertaken pursuant to a policy that was still in effect during the limitations period. (*Id.* at p. 1248.) At the risk of being unduly repetitive, we again note that the writers here challenge conduct—a pattern or practice of discrimination on the basis of age—that occurred during the limitations period.

made clear in word and deed that the employee's attempted further reasonable accommodation is futile, then the employee is on notice that litigation, not informal conciliation, is the only alternative for the vindication of his or her rights." (*Id.* at p. 823.)

■ The circumstances in the cases under review could scarcely be more dissimilar. It is not the employee—the deterred applicant—who is extending the limitations period indefinitely. It is the employer who allegedly continues to refuse to hire older screenwriters for television writing opportunities that occur during the limitations period. Certainly, the employers and the agencies would not be liable for any discriminatory refusal to refer or refusal to hire that occurred more than one year before the complaints in these cases were filed with the Department of Fair Employment and Housing. However, there is no reason an employer should be at liberty to continue to discriminate in new hires during the limitations period, simply because it has done so, allegedly, for the past 20 years. As one court has said, an employer who continuously and systematically violates the law " 'neither deserves nor obtains repose.' " (*EEOC v. Mitsubishi Motor Mfg. of America, Inc.* (C.D.Ill. 1998) 990 F.Supp. 1059, 1087, quoting *EEOC v. Home Ins. Co.* (S.D.N.Y. 1982) 553 F.Supp. 704, 713.) Accordingly, if the employers and agencies enforced a discriminatory policy during the limitations period, claims are timely filed both by writers who applied for jobs during that period and were rejected, and by writers who were deterred from applying for jobs during that period.

We next consider several points related to the pleading of FEHA classwide claims.

IV. *The writers have properly pled classwide claims alleging a pattern and practice of discrimination under FEHA, and have not waived their class claims by declining to assert individual FEHA claims in their second amended complaints.*

The parties raise several issues flowing from the trial court's rejection of the writers' class claims under Government Code section 12965(b), and the court's related rulings allowing the writers to amend their complaints to state individual claims. After rejecting the writers' FEHA class claims, the court ruled that the deterred applicant writers could amend specifically to state individual FEHA claims which were not barred by the statute of limitations, and which pled deterrence with greater specificity, sufficient to overcome certain contradictions with the writers' earlier federal complaint. In addition, actual applicants could amend to plead FEHA claims under the *McDonnell Douglas* model, specifically averring the employer and the position applied for, as well as the age classification.

When the writers amended their complaints, however, they alleged no individual FEHA claims, choosing to stand on their classwide claims of a pattern and practice of discrimination. The writers ask us to consider the trial court's directions as to the amendment of their FEHA claims, to the extent those rulings could be construed as requiring them to allege detailed evidentiary facts supporting individual claims as a necessary predicate for their classwide pattern and practice claims. The employers, on the other hand, argue that a pattern and practice claim is not available under FEHA, particularly with respect to deterred applicants, and that the writers have waived their class claims by refusing to amend their complaints to allege individual FEHA claims. Moreover, the employers and agencies contend that the writers who are deterred applicants—that is, those who did not apply for writing positions—have "pled themselves out of court," because their federal complaint alleged statistics inconsistent with the claim that it would have been futile to apply. We conclude the writers, including deterred applicants, properly stated classwide claims of a pattern and practice of discrimination under FEHA in their first amended complaints.

> A. *The writers may allege a pattern or practice of discrimination in violation of FEHA, and need not plead the particulars of each plaintiff's claim as a predicate for their pattern and practice claims.*

The employers contend nonapplicants cannot state a cause of action under FEHA, because no provision of FEHA authorizes a "pattern or practice" claim. The employers characterize the writers' pattern or practice claim as "bogus" and contend the conduct alleged consists of "multiple, discrete acts alleged by both actual applicants and deterred applicants of 'refusal to hire or employ' on the ground of age," and "[e]ach alleged refusal-to-hire is an adverse act that constitutes a single 'unlawful practice.'" At the pleading stage, they contend, each writer must allege "facts to support that each was over 40, each sought an available writing job with each Employer Defendant for which he or she was qualified, and each was refused."

The employers are mistaken on both counts. Under their view of the law, every plaintiff in a class action would be required to plead facts supporting an individual prima facie case of discriminatory refusal to hire in order to survive a demurrer. No such rule of law exists. On the contrary, nothing in FEHA prohibits classwide claims of systemic discrimination, which is the functional equivalent of a "pattern or practice" claim. Moreover, the writers have properly pled such a claim, and are not required to plead individual prima facie cases of discrimination under the *McDonnell Douglas* model.[33]

---

[33] *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [36 L.Ed.2d 668, 93 S.Ct. 1817].

We begin first with the contention that FEHA does not authorize a pattern or practice claim.

### 1. *The writers may allege a pattern or practice of discrimination under FEHA.*

The employers assert that, unlike Title VII, there is no "pattern or practice" language in FEHA, "and, thus, no such cause of action." They argue that "[i]f the Legislature had wanted such a cause of action in FEHA, it could have expressly said so by copying Title VII's language in § 707." This argument is, at best, disingenuous.

■ First, a class action is, by definition, a pattern or practice claim. "Pattern-or-practice suits, by their very nature, involve claims of classwide discrimination. Such claims involve an allegation that the defendant's actions constitute a pattern of conduct in which the defendant intentionally has discriminated against the plaintiff's protected class." (1 Lindemann & Grossman, Employment Discrimination Law (3d ed. 1996) p. 44, fn. 168.)

■ Second, the fact that section 707 of Title VII uses the term "pattern or practice," while FEHA does not, is irrelevant. Section 707 does not define unlawful practices; it is merely the provision of Title VII which authorizes the government to bring civil actions when an employer "is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by" Title VII. (42 U.S.C. § 2000e-6.) Section 707 is the only provision of Title VII which uses the term "pattern or practice." Nonetheless, it plainly does not prevent private litigants from bringing classwide claims alleging a general pattern or practice of discrimination; such cases have been brought for decades. (E.g., *Cooper v. Federal Reserve Bank* (1984) 467 U.S. 867, 876 [81 L.Ed.2d 718, 104 S.Ct. 2794] ["[t]he crucial difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination is manifest"]; *Lopez v. Metropolitan Life Ins. Co.* (2d Cir. 1991) 930 F.2d 157, 160 ["to make out a pattern or practice case, a plaintiff must show systematic disparate treatment—that is, that intentional racial discrimination is the standard operating procedure of the defendant"].)

■ Nothing in FEHA suggests that its provisions should be construed differently. (See, e.g., *Levy v. Regents of University of California* (1988) 199 Cal.App.3d 1334, 1343 [245 Cal.Rptr. 576] ["[t]o guide us in our analysis of . . . claims under . . . the FEHA . . . , we look at federal law and how claims under title VII . . . are broached"].) Moreover, Government Code, section 12961 of the statute explicitly authorizes either an aggrieved person or the Director of Fair Employment and Housing to file a complaint on behalf of a group or class where an unlawful practice adversely affects a group or

class in a similar manner. In short, the "cause of action" brought by the writers—a classwide claim of discriminatory refusal to hire on the basis of age—is precisely the same as a "pattern or practice" claim, and is plainly available under FEHA, just as such claims are available under federal law.

### 2. *The employers' contention that each individual plaintiff must plead an individual refusal to hire is equally erroneous.*

The employers make several related arguments. They contend that "deterred nonapplicants cannot state a FEHA claim," and point out that "no provision of FEHA includes a word like 'deterred' or 'discouraged'"; a deterred nonapplicant therefore cannot state a claim for age discrimination, because he or she did not apply for employment. They also make the novel contention that, while the writers may at trial prove disparate treatment by establishing the employer's pattern or practice of discriminatory hiring practices based on age (*Teamsters v. United States, supra,* 431 U.S. at pp. 334–335 (*Teamsters*)), they are nonetheless required to plead the same facts as an individual plaintiff bringing a discrimination claim in order to survive a demurrer.

Both arguments are without merit, and disregard principles long ago established under Title VII, and equally applicable to class actions under FEHA. The relevant principles, all of which are well-settled, are these:

1. A claim of discrimination against a class requires the plaintiffs to establish by a preponderance of the evidence that "discrimination was the company's standard operating procedure—the regular rather than the unusual practice." (*Teamsters, supra,* 431 U.S. at p. 336; 1 Lindemann & Grossman, Employment Discrimination Law, *supra,* p. 44.)[34]

2. The class plaintiff "is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy." (*Teamsters, supra,* 431 U.S. at p. 360.) The plaintiff's burden "is to establish a prima facie case that such a policy existed." (*Ibid.*)

3. Plaintiffs "normally seek to establish a pattern or practice of discriminatory intent by combining statistical and nonstatistical evidence, the latter most

---

[34] "[W]hether the company engaged in a pattern or practice of discriminatory hiring practices involves controlling legal principles that are relatively clear. . . . The ultimate factual issues are thus simply whether there was a pattern or practice of . . . disparate treatment and, if so, whether the differences were 'racially premised.'" (*Teamsters v. United States, supra,* 431 U.S. at pp. 334–335, quoting *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at p. 805, fn. 18.)

commonly consisting of anecdotal evidence of individual instances of discriminatory treatment." (1 Lindemann & Grossman, Employment Discrimination Law, *supra*, p. 45.)[35]

 4. "[A] finding of a pattern or practice of discrimination itself justifies an award of prospective relief to the class . . . ." Further proceedings usually are required to determine the scope of individual relief for class members. (*Cooper v. Federal Reserve Bank, supra*, 467 U.S. at p. 876.)

 5. Once a pattern of discrimination has been proved, no per se prohibition precludes relief for nonapplicants. (*Teamsters, supra*, 431 U.S. at p. 367 ["[t]he denial of Title VII relief on the ground that the claimant had not formally applied for the job could exclude from the Act's coverage the victims of the most entrenched forms of discrimination"].)

 These well-established principles require the rejection of the employers' contention that the writers—whether actual applicants or deterred applicants—have not properly pled their claims under FEHA. In the first place, it defies common sense to suggest that the writers must plead facts they are not required to prove in order to establish a right to classwide relief. Plaintiffs in a class action need not prove each class plaintiff was a victim of discrimination; they must prove the existence of a discriminatory policy and, if they do so, they are entitled to classwide relief. (*Cooper v. Federal Reserve Bank, supra*, 467 U.S. at p. 876.) The contention the writers are required to plead facts showing individual refusals to hire, a la *McDonnell Douglas*, or "face dismissal at the pleading stage," is unsupported by either California or federal law.[36] The cases the employers cite neither state nor imply that class plaintiffs must plead facts showing individual instances of discrimination in order to state a classwide claim.[37] Indeed, under federal

---

[35] "Statistics alone may be used to establish a prima facie pattern-or-practice case where a gross, statistically significant, disparity exists. Most courts, however, have indicated that more than statistical evidence is necessary to satisfy the plaintiff's ultimate burden of proving intentional discrimination." (1 Lindemann & Grossman, Employment Discrimination Law, *supra*, p. 45 [fns. omitted].)

[36] See, e.g., *EEOC v. Optical Cable Corp.* (W.D.Va. 2001) 169 F.Supp.2d 539, 551 (allegations of statistical disparities and word-of-mouth recruiting, together with contention that company discriminated against Blacks as a class by maintaining a pattern or practice of racially discriminatory hiring practices that adversely affected the ability of Blacks to become employed by the company, adequately stated a Title VII pattern or practice claim).

[37] The employers cite *Cucuzza, supra*, 104 Cal.App.4th at page 1038 and *Levy v. Regents of University of California, supra*, 199 Cal.App.3d at pages 1343–1347, for the proposition that California courts require specified "*prima facie* elements to state a cause of action for unlawful discrimination . . . ." Neither of those cases involved classwide claims; moreover, neither case says that an individual plaintiff is required to plead those prima facie elements in order towithstand a demurrer. Both *Cucuzza* and *Levy* were appeals from a grant of summary judgment

law, even an individual plaintiff is not required to plead facts establishing a prima facie case; the complaint is only required to give the defendant "fair notice of the basis for [plaintiff's] claims." (*Swierkiewicz v. Sorema N.A.* (2002) 534 U.S. 506, 511, 512, 514 [152 L.Ed.2d 1, 122 S.Ct. 992] [prima facie case evidentiary standard "should not be transposed into a rigid pleading standard for discrimination cases"]; *Bennett v. Schmidt* (7th Cir. 1998) 153 F.3d 516, 518–519 [the defendants "received notice that [the plaintiff] believed that their refusal to hire her was racial discrimination; that is all the notice a complaint has to convey"].)[38]

While the pleading standard is stricter in California, the plaintiff is required only to set forth the essential facts of his case " 'with particularity sufficient to acquaint a defendant with the nature, source and extent of his cause of action.' " (*Ludgate Ins. Co. v. Lockheed Martin Corp.* (2000) 82 Cal.App.4th 592, 608 [98 Cal.Rptr.2d 277] [describing these requirements as a "fair-notice test"], quoting *Youngman v. Nevada Irrigation Dist.* (1969) 70 Cal.2d 240, 245 [74 Cal.Rptr. 398, 449 P.2d 462].) These are classwide claims of systemic discrimination, where the writers' ultimate evidentiary burden is to prove that age discrimination was the employer's standard operating procedure. (*Teamsters, supra,* 431 U.S. at p. 336.) Contrary to the employers' contention, we think it is clear the writers have pled "the statutory elements" necessary to state a FEHA cause of action as described in Government Code section 12940.

■■■ Government Code section 12940 provides that "[i]t shall be an unlawful employment practice . . . [¶] . . . [f]or an employer, because of the . . . age . . . of any person, to refuse to hire or employ the person . . . ." (Gov. Code, § 12940, subd. (a).) The writers' complaints allege each employer has adopted or maintained a companywide policy or practice of age discrimination in employment by refusing to hire plaintiffs on the basis of age, and by adopting ageist hiring policies that have deterred plaintiffs from seeking employment opportunities. They also allege they have applied for and have been rejected and/or have been deterred from seeking television writing employment as a result of the employers' practices. They further allege the employers have hired

---

for the employer on individual claims of discrimination, and did not address pleading requirements.

[38] See also California Code of Regulations, title 2, section 7286.6, subdivision (a), entitled "Unlawful Practices and Individual Relief," which provides that: "In allegations of employment discrimination, a finding that a respondent has engaged in an unlawful employment practice is not dependent upon a showing of individual back pay or other compensable liability. Upon a finding that a respondent has engaged in an unlawful employment practice and on order of appropriate relief, a severable and separate showing may be made that the complainant, complainants or class of complainants is entitled to individual or personal relief including, but not limited to, hiring, reinstatement or upgrading, back pay, restoration to membership in a respondent labor organization, or other relief in furtherance of the purpose of the Act."

statistically significant lower numbers of older writers than would be expected given the relevant qualified applicant pool, and these disparities increase in direct relationship to age. They also describe anecdotal evidence of intentional discrimination. We discern no missing statutory element in these allegations.

### 3. *The same conclusion applies to deterred applicants.*

Our conclusion that the writers have properly stated classwide claims of discrimination in hiring does not differ for those writers who allege they were deterred from applying for television writing opportunities by the employers' policies of discrimination. The putative class is no different from those upheld in other classwide suits. (*Domingo v. New England Fish Co.* (9th Cir. 1984) 727 F.2d 1429, 1442 [upholding the certification of a class of "all nonwhites who either were employed by [the defendant], applied for employment with [the defendant], or were deterred from applying for employment with [the defendant]" at any time beginning 300 days prior to the date the plaintiff filed his charge with the Equal Employment Opportunity Commission].) Moreover, there is no merit in the argument that FEHA does not refer to "deterred" or "discouraged" applicants. Title VII likewise does not refer to such applicants, but relief is nonetheless available to them; otherwise "victims of the most entrenched forms of discrimination" might be excluded from coverage. (*Teamsters, supra*, 431 U.S. at p. 367.) So it is under FEHA. Indeed, California regulations interpreting FEHA define "applicant" as including "an individual who can prove that he or she has been deterred from applying for a job by an employer's . . . alleged discriminatory practice." (Cal. Code Regs., tit. 2, § 7286.5, subd. (h).)

Of course, the question whether a deterred applicant will be able to obtain individual relief is a different question, and one that will not arise until and unless the writers prove the employers have enforced a companywide policy of discrimination. If the writers are able to do so, they will be entitled to injunctive and perhaps other classwide relief. It is only at this point that individual claims of class members become germane. To obtain individual relief, after a pattern or practice of discrimination is proved, a writer who did not apply for television writing opportunities would have "the not always easy burden of proving that he would have applied" for a position, during the limitations period, had it not been for the employer's discriminatory practices, and would have been discriminatorily rejected had he applied. (*Teamsters, supra*, 431 U.S. at pp. 368–369 & fn. 52.) That, however, is not the question before us. The question is merely whether a proper classwide claim of discrimination has been stated under FEHA, and the answer is that it has, as to both deterred and actual applicants.

### B. *Claims by deterred applicants may not be dismissed on the basis of allegedly inconsistent statistics pled in the writers' federal complaint.*

Before leaving the subject of deterred applicants, we address one other point raised by the parties in connection with the trial court's ruling. The trial court observed that, in the earlier federal complaint in *Wynn, supra,* 234 F.Supp.2d 1067, the writers alleged statistics "substantially inconsistent with viable deterred applicant claims." The writers in *Wynn* alleged, for example, that during the 1997/1998 broadcast season, writers over age 40 comprised one-third or more of the writing staffs of most employer defendants. The court concluded that the "deterred applicant futility requirements" described in *Teamsters*—which referred to a formal job application as a "futile gesture"—must be pled with greater specificity. While the complaints alleged that writers were deterred from applying for television writing opportunities and "reasonably believe[d] that it would be a futile gesture" to do so for a number of reasons, the court viewed these allegations as conclusory.[39] The writers were given "leave to plead individual claims with facts showing a legal basis for overcoming the federal pleading contradictions sufficient to satisfy, for pleading purposes, the *Teamsters* and *Cucuzza* requirements."

As a preliminary matter, we note that the trial court had already rejected the writers' FEHA class action claims, and was instructing the writers how to amend their complaints to state individual claims. This may account for its statement that "more than pattern and practice allegations" were needed to plead an individual deterred applicant claim. While we do not necessarily quarrel with that point, it does not apply where the writers are bringing only classwide claims of a pattern and practice of intentional discrimination. However, because the trial court's ruling might be read to require more specific pleading of futility in connection with the writers' classwide pattern and practice claim, we address the point here.

At the pleading stage of a classwide pattern and practice claim, the "*Teamsters* and *Cucuzza* requirements" are completely irrelevant.[40] As the

---

[39] The complaints alleged the writers "reasonably believe that it would be a futile gesture because they do not have an agent and are aware of [the employer's] policy of refusing to accept scripts not submitted by a represented writer and/or they and/or their agent are aware of facts and circumstances some of which are described below establishing [the employer's] well deserved reputation for ageist hiring practices with respect to television writing opportunities . . . ."

[40] The citation of the *Cucuzza* case is puzzling. As discussed elsewhere, in *Cucuzza, supra,* 104 Cal.App.4th 1031, the court applied the *Richards* principles to find that the plaintiff's FEHA claim was time-barred. (*Id.* at p. 1043 [action based on conduct occurring prior to a specified date was barred by statute of limitations, because the plaintiff's situation had become permanent "in that she should have known that further efforts to resolve the situation would be

employers correctly observe, *Teamsters* "was not a pleading case, and no subsequent case sets out the pleading requirements for the futile gesture theory . . . ." It is unsurprising that no cases describe pleading requirements for a theory that has no relevance at this stage of a classwide pattern or practice claim.

*Teamsters* involved an appeal after the trial of a case in which the government alleged the employer had engaged in a pattern or practice of racial discrimination in hiring. The Supreme Court upheld findings that the government had proved that racial discrimination "was the company's standard operating procedure—the regular rather than the unusual practice." (*Teamsters, supra*, 431 U.S. at p. 336.) The finding of a pattern and practice, without more, justified an award of prospective relief (*id.* at p. 361), and *Teamsters* then discussed the question of individual relief for the employer's past discriminatory acts, a question which does not arise until after a policy of unlawful discrimination has been proved. (*Ibid.*) The discussion of relief included whether seniority relief could be awarded to nonapplicants. The court decided that an incumbent employee's failure to apply for a job "is not an inexorable bar to an award of retroactive seniority," and that individual nonapplicants "must be given an opportunity to undertake their difficult task of proving that they should be treated as applicants and therefore are presumptively entitled to relief accordingly." (*Id.* at p. 364.) As the court described it, "his [the nonapplicant's] is the not always easy burden of proving that he would have applied for the job had it not been for those practices." (*Id.* at pp. 367–368.) In explaining its conclusion that failure to apply should not be a per se bar to relief, the court made several observations, including these:

1. "A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection."[41] (*Teamsters, supra*, 431 U.S. at p. 365.)

2. "When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture

---

futile"].) *Cucuzza* had nothing to do with claims by deterred applicants or with the "futile gesture" doctrine described in *Teamsters*.

[41] "The same message ["Whites Only" on the hiring office door] can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices—by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups." (*Teamsters, supra*, 431 U.S. at p. 365.)

he is as much a victim of discrimination as is he who goes through the motions of submitting an application." (*Teamsters, supra,* 431 U.S. at pp. 365–366.)

The employers seize upon the terms "certain rejection" and "futile gesture" to conclude that nonapplicants in these cases cannot state a claim for discrimination, because the writers' own complaints show that some writers over 40 have been hired; therefore, rejection is not "certain" and nonapplicants cannot sue. This is not correct. *Teamsters* makes two points very clear: deterred applicants are not precluded from seeking relief from discrimination, although the burden of obtaining individual relief will not be an easy one. But a third point is also clear: issues of the futility of application or the certainty of rejection have nothing to do with whether the writers have properly pled a classwide claim of systematic discrimination on the basis of age. In short, nothing in *Teamsters* supports the view that writers claiming classwide discrimination must "plead deterrence with greater specificity" than they have done in their first amended complaints. Nor does any other case cited to us, none of which involve dismissal of a class action complaint at the pleading stage. Indeed, the only cases the employers cite for the proposition that allegations of a pattern and practice of discrimination are an insufficient basis for inclusion of deterred applicants in the class of potential claimants are the trial court decision under review and the district court's decision in *Wynn*.[42] Moreover, even *Wynn* did not go so far as to preclude the writers, on the basis of the statistics they pled, from relying on a deterred applicant theory.[43]

---

[42] In *Wynn,* the court stated that the "standard for pursuing a *Teamster's* 'pattern-or-practice' discrimination claim . . . is not an equivalent standard for proceeding with a deterred applicant theory. In order to pursue the latter claim, [the writers] must allege facts sufficient to support an inference that applying for a job would have been a 'futile gesture.' " (*Wynn, supra,* 234 F.Supp.2d at p. 1098.) We respectfully disagree with the district court's assessment. Nothing in *Teamsters* suggests that plaintiffs must allege specific facts supporting the futility of job applications at the pleading stage, before they have proved a pattern and practice of intentional discrimination. Under *Teamsters,* the futility question arises only after liability has been established and individual class members seek relief. The district court cites no pertinent authority for requiring otherwise. The single case it cites is *Yartzoff v. Thomas* (9th Cir. 1987) 809 F.2d 1371, 1374. *Yartzoff,* however, is inapposite. *Yartzoff* involved an individual claim of discrimination, not a class action/pattern or practice claim, and was on review after a grant of summary judgment, not at the pleading stage. It holds only that there was insufficient evidence in the record to establish the plaintiff's prima facie case, because the plaintiff failed to apply for the open positions, and the record did not show he was discouraged from applying. (*Ibid.*) The court merely observes, as a prelude to this conclusion, that "[i]n unusual circumstances, failure to apply for a position may not vitiate a Title VII action." (*Ibid.*)

[43] The district court observed: "While the Court is highly skeptical, in light of the alleged statistics, of [writers]' ability to show that applying for a position with an Employer Defendant—whether directly or via an Agency Defendant—would have been futile, the Court declines to make that determination at this time." (*Wynn, supra,* 234 F.Supp.2d at p. 1102, fn. omitted.) And again: "Thus, while it appears doubtful that many, if any, [writers] will be able

In sum, it would be premature to conclude—on the basis of 1997/1998 statistics alleged in the federal complaint, before any discovery has been conducted, and in the absence of any record whatsoever—that no class member, at the relief stage of class action proceedings, will be able to prove he or she would have applied for a position had it not been for a particular employer's discriminatory practices. (*Teamsters, supra,* 431 U.S. at p. 368.) That determination is plainly a matter for another day.

### C. *The writers have not waived appellate review of their FEHA classwide claims.*

Before turning to other aspects of the trial court's ruling, we address an argument raised by some of the employers in a demurrer to the writers' writ petition, and by others in their return. They contend the writers have waived appellate review of the trial court's order sustaining demurrers to their FEHA claims, since the court's ruling barring a class action was "without prejudice to the Writers' right to plead individual FEHA claims." Since the writers filed a second amended complaint without pleading individual FEHA claims, the employers contend they have waived review of the trial court's demurrer rulings on those claims. Moreover, and more significantly, because the writers did not assert individual FEHA claims, they cannot obtain class certification, and their claim the trial court erred in dismissing their class claims under section 12965(b) is moot. Neither argument has merit.

First, because the writers have not sought review of the trial court's demurrer rulings that relate to individual FEHA claims, the contention they have waived the issue is irrelevant. The writers expressly state they were and are "not asserting individual claims, but class claims predicated upon systemic practices of discrimination in violation of § 12940 of FEHA."

Second, the refusal to assert individual FEHA claims does not render class claims moot. The mootness argument is founded in the contention that the writers cannot meet the requirements for class certification without asserting individual claims, since a class representative "cannot have a cause of action that is sufficiently typical of the class if he or she does not have a personal claim at all." The argument is dependent on two incorrect assumptions. The first is that no pattern or practice claim is available under FEHA. We have already rejected that contention. A second, related assumption is that a writer does "not have a personal claim at all" simply because he or she asserts no individual claim for relief.[44] That notion is also seriously flawed.

---

to satisfy the requirements for a deterred applicant theory, the Court will not preclude such a theory at this time." (*Id.* at p. 1103.)

[44] The employers cite *Hart v. County of Alameda* (1999) 76 Cal.App.4th 766, 775 [90 Cal.Rptr.2d 386] for the proposition that a plaintiff cannot be typical of the class if he or she has no personal cause of action. *Hart* involved multiple defendants, and merely applied the

Regardless of whether any writer asserts an individual claim, all writers seek classwide injunctive relief, to which they will be entitled if they are able to prove that any employer has engaged in systematic disparate treatment.[45] (See *Robinson v. Metro-North Commuter R.R. Co.* (2d Cir. 2001) 267 F.3d 147, 171 [class representatives who settled and were therefore not entitled to any further monetary relief nonetheless "stand to benefit from any class-wide injunctive relief that may be ordered" and "plainly have an interest in . . . pursuing the liability stage of the pattern-or-practice claim . . . because . . . successful prosecution . . . is a prerequisite for the issuance of class-wide injunctive relief"]; see also *Anthony v. General Motors Corp.* (1973) 33 Cal.App.3d 699, 702 [109 Cal.Rptr. 254] [reversing order of dismissal after trial court ruled action could not be maintained as class action and the plaintiffs refused to amend their complaint to state individual causes of action]; *Bunker v. County of Orange* (2002) 103 Cal.App.4th 542, 546 [126 Cal.Rptr.2d 825] [trial court granted motion to strike class allegations and gave the plaintiff leave to amend to file as an individual; the plaintiff stipulated to abandoning his individual claim except insofar as it supported a right to proceed with a class action, allowing entry of judgment pursuant to the stipulation; the Court of Appeal proceeded to the merits and reversed the judgment of dismissal].) Accordingly, the fact that the writers refused to amend their complaints to assert individual claims does not negate their ability to represent the class, and does not render their class claims moot.[46]

rule that a plaintiff must have actually been injured by each of the defendants he sues. (*Id.* at pp. 775–776 [plaintiff had no standing to sue 22 of the 25 county defendants and was therefore not a proper class representative in claims against those counties].) Here, there is no question that the writers have standing to assert claims against each employer; the employers do not contend otherwise.

[45] The employers point out a class action is merely a procedural device for collectively litigating substantive claims, citing *Corbett v. Superior Court* (2002) 101 Cal.App.4th 649, 670 [125 Cal.Rptr.2d 46]. That is exactly so. The fact that class actions " 'are provided only as a means to enforce substantive law' " (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 918 [103 Cal.Rptr.2d 320, 15 P.3d 1071], quoting *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 462 [115 Cal.Rptr. 797, 525 P.2d 701]) does not mean, however, that the writers must plead individual claims. The assertion that the employers have engaged in a pattern and practice of discrimination is a "substantive" claim common to all.

[46] The talent agencies also make a waiver argument which, although different, also is without merit. The agencies contend that filing second amended complaints containing only a claim under the UCL waives "any right to appeal the Superior Court's rulings on the demurrers" to the first amended complaints against the talent agencies. This is because the trial court gave the writers leave to amend both their FEHA aiding and abetting claims (to state individual claims) and their Unruh Civil Rights Act class claims (to allege business transactions rather than employment discrimination claims). Amending their complaints and omitting previously asserted causes of action that could have been amended ordinarily waives any error in sustaining the first demurrer. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966, fn.2 [9 Cal.Rptr.2d 92, 831 P.2d 317].) In this case, however, the writers chose not to assert individual claims, and likewise chose to stand on their Unruh Civil Rights Act claims as originally pled, as they are free to do. As a result, no class claims remained, and they were

We turn now to the additional issues raised by the appeals in the suits against the talent agencies.

*V. The first amended complaints sufficiently pled the talent agencies' liability for aiding and abetting violations of FEHA by the employers.*

The trial court, after eliminating the writers' class claims under FEHA, ruled that if the writers sought to plead individual FEHA aiding and abetting claims, "they must, as a minimum, allege the identity of the aider and abettor, knowledge that the primary violator's conduct constituted a breach of duty, and how the named defendant assisted in or encouraged the predicate violation." The propriety of that ruling is not at issue in these appeals, which relate only to the writers' classwide claims. The writers again argue, however, that the trial court's ruling on the individual claims should not be construed to require the same specificity—each writer pleading how each agency assisted or encouraged particular discriminatory acts against him or her individually—in order to bring a classwide claim for aiding and abetting under FEHA, and the agencies argue the contrary.[47] The writers are correct.

As the writers point out, their aiding and abetting claims are based upon allegations that each agency assisted each employer in carrying out a systemic policy of age discrimination in hiring against older writers as a class. FEHA makes it an unlawful practice for "any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this part, or to attempt to do so." (Gov. Code, § 12940, subd. (i).) A talent agency would be liable for aiding and abetting an employer's violation of FEHA if the agency knew the employer's conduct violated FEHA and gave "substantial assistance or encouragement to the [employer] to so act . . . ." (*Fiol v. Doellstedt* (1996) 50 Cal.App.4th 1318, 1325 [58 Cal.Rptr.2d 308].)[48]

The writers, as we have already held, have properly stated classwide claims of systemic discrimination by the employers. In their complaints against the

entitled to take this death knell appeal of the court's rulings on those class claims. (See pt. I, *ante.*)

[47] The talent agencies argue that the trial court found no difference in the aiding and abetting pleading standard, whether applied to class or individual claims. In fact, the trial court did not address the pleading standard for class claims. The court stated, in connection with individual claims, that "[p]leading an industry-wide pattern or practice does not relieve Writers of the obligation to plead the basic elements of viable aiding and abetting claims."

[48] Because FEHA provides no definition of aiding and abetting, courts have used the common law definition: " 'Liability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.' " (*Fiol v. Doellstedt, supra,* 50 Cal.App.4th at pp. 1325–1326, quoting *Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 846 [33 Cal.Rptr.2d 438].)

talent agencies, the writers first explain the unique hiring process in the industry, under which the availability of writing opportunities is communicated primarily through the talent agencies. The writers then allege the agency is "well aware of the pattern or practice of age discrimination by each Named Employer in connection with its employment and business dealings with older writers." In the following paragraph, each complaint asserts the basis for the agency's awareness of the employers' ageist practices, including public statements by network executives and allegations that the employers have communicated to the agency their desire to hire younger writers or to exclude older writers. Subsequent paragraphs allege the agency's financial incentive to discriminate, the agency's own pattern and practice of discrimination with respect to its representation and referral of older writers, and evidence of the agency's pattern or practice of intentional discrimination, including ageist comments, statistical disparities, and instances of refusal to submit older writers for television writing opportunities with networks and studios. The complaints specifically allege that the agency "has given substantial assistance and encouragement to each Named Employer in carrying out its unlawful employment and business policies and practices in at least five ways . . . ," including the agency's refusal to represent older writers, failure to refer the older writers it represents to the employers as zealously as younger writers, communicating ageist stereotypes and motivations and thus discouraging older writers from seeking employment with the employers, and so on.

 In our view, the complaints clearly allege the agencies knew the employers were engaged in systemic discrimination on the basis of age, and gave "substantial assistance or encouragement" to the employers by virtue of their own referral practices, screening out older writers in favor of younger ones.[49] If the writers are able to prove these allegations, they will have established an agency's liability for aiding and abetting the employers.[50] The allegations meet California's fair-notice test, as they describe the writers' case " 'with particularity sufficient to acquaint [the agency] with the nature, source and extent of [the writers'] cause of action.' " (*Ludgate Ins. Co. v. Lockheed Martin Corp., supra*, 82 Cal.App.4th at p. 608, quoting *Youngman v. Nevada Irrigation Dist., supra*, 70 Cal.2d at p. 245.) Nothing more is required.

---

[49] The agencies insist, at considerable length, that the writers have alleged none of the requisite elements of an aiding and abetting claim: a pattern or practice of discrimination by the employer, the agency's knowledge that the employer's conduct constituted age discrimination, and substantial assistance or encouragement of the employer's discriminatory acts. Our reading of the complaints compels the opposite conclusion.

[50] The same conclusion applies with respect to the writers' claims, in their suits against the employers, that network defendants have assisted or encouraged studio defendants to systematically exclude older writers.

VI. *Allegations that the talent agencies systematically refuse to represent older writers seeking television writing opportunities are cognizable under the Unruh Civil Rights Act.*

▉ The trial court ruled that the writers failed to state a claim under the Unruh Civil Rights Act (the Act). The court concluded that the gravamen of the complaints rested in employment discrimination, and the Act does not reach employment discrimination claims. Both of the court's statements are literally correct. The writers are suing because they cannot obtain television-writing opportunities—that is, employment—with the networks and studios, and the Supreme Court has held that the Legislature intended "to exclude the subject of discrimination in employment" from the Act. (*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 500 [86 Cal.Rptr. 88, 468 P.2d 216] (*Alcorn*).) However, the court's holding in *Alcorn* was made in the context of a claim by an employee against an employer, and subsequent precedents have explained that the Act does not cover "the *employer-employee* relationship." (*Isbister v. Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72, 83, fn. 12 [219 Cal.Rptr. 150, 707 P.2d 212].) No such relationship exists between the talent agencies and the writers.[51] Instead, the agencies are business establishments that provide a service to their clients, and the Act on its face forbids them from discriminating in the provision of that service. We conclude that the exclusion of "discrimination in employment" from the Act's coverage does not extend to claims of discrimination in the services provided by talent agencies to their clients.[52]

The Act (Civil Code section 51) provides in pertinent part: "All persons within the jurisdiction of this state are . . . entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (Civ. Code, § 51, subd. (b).)[53]

---

[51] The writers do not challenge the trial court's ruling as it applies to their claims against the employers under the Act.

[52] In cases involving application of the Act, the parties are required to serve a copy of their briefs on the State Solicitor General at the Office of the Attorney General. Parties failing to comply with this requirement are afforded a reasonable opportunity to cure the failure and, "in that instance, the court shall allow the Attorney General reasonable additional time to file a brief in the matter." (Civ. Code, § 51.1.) In this case, the parties' briefs were not initially served on the Solicitor General, but were subsequently served on December 9 and December 15, 2003. The Attorney General has not filed or sought the opportunity to file a brief in these cases.

[53] Section 51 states all persons are so entitled "no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition . . . ." (Civ. Code, § 51, subd. (b).) However, it is undisputed that the Act reaches age discrimination. (*O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790, 792 [191 Cal.Rptr. 320, 662 P.2d 427]; *Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 725 [180 Cal.Rptr. 496, 640 P.2d 115] [the Act bars all types of arbitrary discrimination; its reference to particular bases of discrimination is illustrative rather than restrictive].)

The talent agencies do not dispute that they are business establishments that provide a service—representing writers, actors and others seeking professional opportunities with networks and studios. However, they contend that *Alcorn* and *Rojo v. Kliger* (1990) 52 Cal.3d 65 [276 Cal.Rptr. 130, 801 P.2d 373] (*Rojo*), effectively eliminate any possible liability under the Act because their services are "employment related," and claims under the Act are prohibited "in the employment context." As will appear, neither case reaches so far.

The Supreme Court first addressed the issue in 1970 in *Alcorn*. The court rejected a plaintiff's claim that his discharge from employment because of his race constituted an unlawful discrimination under the Act. (*Alcorn, supra,* 2 Cal.3d at pp. 499–500.) It concluded that the concurrent enactment in 1959 of the Fair Employment Practices Act (FEHA's predecessor) and the Act "indicated a legislative intent to exclude the subject of discrimination in employment from the latter act."[54] (*Alcorn, supra,* at p. 500.) The court observed there was " no indication that the Legislature intended to broaden the scope of [Civil Code] section 51to include discriminations other than those made by a 'business establishment' in the course of furnishing goods, services or facilities to its clients, patrons or customers." (*Ibid.*) Its conclusion was substantiated, the court stated, by the concurrent enactment of extensive provisions governing discrimination in employment, which "provid[ed] for administrative procedures for relief from such discrimination," including hiring, reinstatement, backpay and so on. (*Ibid.*) Twenty years later, the court again stated, in a discussion of the derivation of a FEHA provision, that "the Unruh Civil Rights Act has no application to employment discrimination." (*Rojo, supra,* 52 Cal.3d at p. 77.)[55]

■ Nothing in *Rojo* or *Alcorn* suggests that a business establishment which provides "employment related" services, or services "in the employment context," is exempt from the Act. It is reasonably plain from *Rojo*, *Alcorn* and other cases on the subject that "employment discrimination" claims not covered by the Act are confined to claims by an employee against his employer, or against an entity in the position of the employer.

---

[54] These concurrent enactments took place in 1959, when section 51—which was added to the Civil Code in 1905—was amended, inter alia, to entitle citizens to equal "services" in addition to the original "advantages, facilities, and privileges," and to specify its application to "all business establishments of every kind whatsoever." (See Historical Note, 6 West's Ann. Civ. Code (1982 ed.) foll. § 51, p. 312.)

[55] *Rojo* held, among other things, that "FEHA does not supplant other state laws, including claims under the common law, relating to employment discrimination . . . ." (*Rojo, supra,* 52 Cal.3d at p. 70.)

Indeed, in *Isbister v. Boys' Club of Santa Cruz, Inc., supra,* 40 Cal.3d 72 (*Isbister*), the Supreme Court virtually said as much. Explaining its statement about legislative intent in *Alcorn,* the court said: "In context, the statement meant only that the *employer-employee* relationship was not covered by the Act, which was confined to discriminations against recipients of the 'business establishment's . . . goods, services or facilities.'" (*Isbister, supra,* 40 Cal.3d at p. 83, fn. 12, italics in original.)

The writers who are would-be clients of the talent agencies—and thus "recipients of the [talent agency]'s . . . services"—have no "employer-employee relationship" with the talent agencies. The relationship between the talent agencies and the writers they represent is that between a business establishment and its "clients, patrons or customers." (*Alcorn, supra,* 2 Cal.3d at p. 500.) The agencies derive their revenues from the writers and others they represent; an agency "generally receives a percentage of the writer's income." That is not comparable to an "employer-employee relationship," which is the only relationship the Supreme Court has stated is not covered by the Act.[56]

The agencies contend other courts applying *Alcorn* and *Rojo* consider, as the trial court did, "the gravamen of [the complaints] in determining whether a putative Unruh Act claim is, in substance, one for employment discrimination . . . ." While we do not quarrel with that general statement, a further principle can be derived from the cases cited by the talent agencies. The cases uniformly involve claims by an employee, or person in the position of an employee, against an employer or an entity in the position of employer. (E.g., *Sprewell v. Golden State Warriors* (9th Cir. 2001) 266 F.3d 979, 989 [Latrell Sprewell's claim against the Warriors and the National Basketball Association (NBA), challenging his suspension by the NBA and contract termination by the Warriors, "stemmed from his employment relationships with the NBA and the Warriors" and therefore failed to state a claim under the Act]; *Strother v. Southern Cal. Permanente Medical Group* (9th Cir. 1996) 79 F.3d 859, 873–874 [doctor's discrimination claim against her medical group, whether she was characterized as an employee or a bona fide partner in the group, was not covered by the Act; "her relationship to the Medical Group is more like that of an employee than that of a 'client, patron or customer'"; "California courts continue to exclude employees from Unruh [Civil Rights] Act coverage"]; *Robinson v. Ladd Furniture, Inc.* (M.D.N.C. 1994) 872

---

[56] Another way of illustrating the difference between employment discrimination claims not covered by the Act and claims that are covered by the Act is to follow the flow of money. In an employer-employee or any comparable relationship, the money flows from the employer or comparable entity to the employee or independent contractor. In the relationship between a business establishment and its "clients, patrons or customers," the money flows in the opposite direction, from the client to the business establishment. The latter is the case here. The writers pay the talent agencies, not the reverse.

F.Supp. 248, 250 [reference to earlier court ruling dismissing claim under the Act because the Act "does not apply to claims of discrimination in employment either as an independent contractor or as an employee"]); *Gauvin v. Trombatore* (N.D.Cal. 1988) 682 F.Supp. 1067, 1073 [rejecting Act employment discrimination claims under the Act by owner of trucking company against the California Department of Transportation, the prime contractors and trucking subcontractors on a state freeway project; Act does not apply to the employment relationship, "regardless of whether the relationship between the parties is characterized as employer-employee or contractor-subcontractor"; Act applies only "in the context of the supply of services or facilities to clients, patrons, or customers"].)

In short, the agencies are correct that the claims made in the cited cases are, in substance, claims for employment discrimination; they are all premised on an "employer-employee relationship" between the plaintiffs and the defendants. (*Isbister, supra,* 40 Cal.3d at p. 83, fn. 12.) The writers' claims against the agencies, however, are not. We acknowledge the obvious fact that the writers are suing because they cannot obtain television writing opportunities—that is, employment—with the networks and studios; the complaints are rife with references to the loss of or lack of access to "television writing opportunities." And, the writers describe their damages as "loss of employment and business and opportunities for employment and business and lost income." However, those facts do not convert the writers' claims against the talent agencies into the kind of "discrimination in employment" that is outside the coverage of the Act. The writers are suing the agencies for illegally refusing to provide services that are essential to the writers' ultimate objective of obtaining employment with the networks and studios. The writers allege they cannot obtain opportunities with the networks and studios because they cannot secure the representation services of the talent agencies, without which it is "virtually impossible for an individual to apply for a television writing opportunity—much less actually obtain such an opportunity . . . ." Specifically, the writers complain that the talent agencies have "fail[ed] and refus[ed] to contract for representation with (or to otherwise transact business with) [the writers] on the basis of age." The writers' claim is for discriminatory refusal to provide services to the writers; it is not a claim of discrimination in "the employer-employee relationship." (*Isbister, supra,* 40 Cal.3d at p. 83, fn. 12.)

In sum, while the writers' claims against the agencies unquestionably relate to their objective of obtaining television writing opportunities with the networks and studios, they are patently not the sort of claims that are excluded from coverage under the Act. Excluded claims are confined to those involving an employer-employee or equivalent relationship between a plaintiff and defendant. The statute on its face applies to the talent agencies

as business establishments providing services to their writer clients. Excepting talent agencies from the purview of the Act would be fundamentally at odds both with the Act's plain language and with the Supreme Court's direction "to interpret the Act's coverage 'in the broadest sense reasonably possible.' " (*Isbister, supra,* 40 Cal.3d at p. 76, quoting *Burks v. Poppy Construction Co.* (1962) 57 Cal.2d 463, 468 [20 Cal.Rptr. 609, 370 P.2d 313].) Consequently, we conclude talent agencies are subject to the Act, and the trial court erred in sustaining their demurrers to the writers' claims under the Act.

Before leaving this subject, one anomaly must be noted. The parties confine their discussion to the Act, but the complaints specifically allege violations of Civil Code section 51.5, which the writers identify as the Act. In fact, the Act consists only of Civil Code section 51, which is quoted at the beginning of this discussion. Civil Code section 51.5 was added to the code in 1976, and, like the Act, applies to "business establishment[s] of any kind whatsoever . . . ." (Civ. Code, § 51.5, subd. (a).) Section 51.5 specifies that business establishments may not "discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state" on the same bases listed in the Act.[57] Few cases have construed section 51.5.[58] The legislative intent to exclude employment discrimination from the Act, which *Alcorn* drew from the concurrent enactment of the Act and FEHA's predecessor, would not necessarily apply to section 51.5, which was enacted more than 16 years later. In any event, our conclusion that the Act applies, since there is no employer-employee relationship between the agencies and the writers, necessarily means that the writers' claims are appropriately brought under either or both the Act and Civil Code section 51.5.

We proceed to the question whether amendments to FEHA, which now permits claims against employment agencies for age discrimination, are retroactive.

---

[57] The Act includes "ancestry," while Civil Code section 51.5 does not, and section 51.5 includes "creed," while the Act does not, but both provisions include national origin and religion. Neither specifies age; as previously noted, the classifications in the Act have been construed as illustrative rather than restrictive. (See fn. 53, *ante.*) The same is true of the classifications in Civil Code section 51.5. (*Roth v. Rhodes* (1994) 25 Cal.App.4th 530, 537 [30 Cal.Rptr.2d 706].)

[58] See *Strother v. Southern California Permanente Medical Group, supra,* 79 F.3d at p. 875 (interpreting Civil Code section 51.5 "consistently with § 51" and finding the plaintiff doctor, as either a partner or employee of her medical group, could not bring a claim under section 51.5); *Roth v. Rhodes, supra,* 25 Cal.App.4th at pp. 537, 539 (observing section 51.5 expands on section 51 by specifying forms of discrimination, including refusal to deal, and holding that discrimination in leasing office space based on profession was not prohibited). Section 52, subdivision (a) of the Civil Code, which governs damages and other relief, applies to both the Act and section 51.5.

VII. *Amendments to FEHA effective January 1, 2003, adding age to the bases of discrimination constituting unlawful employment practices by employment agencies, do not apply retroactively.*

The trial court concluded the writers cannot sue the talent agencies for direct violations of FEHA, because FEHA did not create direct liability for age discrimination by employment agencies until the passage of amendments effective January 1, 2003.[59] The trial court found those amendments constituted a change in the law and do not have retroactive effect. We agree that the amendments, as they apply to employment agencies in Government Code, section 12940, subdivision (d), do not apply retroactively. We describe first the circumstances which gave rise to the FEHA amendments, and then turn to the question of their retroactivity.

### A. *Background of the FEHA amendments.*

From its passage in 1980 and until 2003, FEHA contained two separate provisions. One of them, Government Code, former section 12940, governed employers and, in various subdivisions, employment agencies and others. That section prohibited various discriminatory practices based on race, religious creed, color and other classifications. A separate provision, former section 12941, subdivision (a), governed discrimination on the basis of age, and applied only to employers. Specifically, former section 12941, subdivision (a), made it an unlawful employment practice "for an employer to refuse to hire or employ, or to discharge, dismiss, reduce, suspend, or demote, any individual over the age of 40 on the ground of age . . . ."

In June 2002, the California Supreme Court, affirming a Court of Appeal decision, held that neither Government Code, section 12940 nor section 12941 prohibited discrimination in the terms, conditions or privileges of employment on the basis of age. (*Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 267 [121 Cal.Rptr.2d 203, 47 P.3d 1069] (*Esberg*) [employer's refusal to fund advanced degree for 53-year-old worker, while doing so for younger employees, did not violate FEHA].) *Esberg* found the statute was unambiguous: "Section 12940 prohibit[ed] employment discrimination in the furnishing of benefits, but not employment discrimination based on age, while section 12941 prohibit[ed] employment discrimination based on age, but not employment discrimination in the furnishing of benefits." (*Esberg, supra,* 28 Cal.4th at p. 269.)

The Legislature then passed Assembly Bill No. 1599, which amended Government Code, section 12940 and repealed section 12941. According to

---

[59] FEHA has always prohibited any person from aiding or abetting an act forbidden by FEHA. (Gov. Code, § 12940, subd. (i).)

its legislative history, Assembly Bill No. 1599 addressed the *Esberg* decision "by deleting the California code section which address[ed] age discrimination [section 12941] and transferring that prohibition to its companion code section [section 12940] which addresses the other prohibited bases of discrimination. This results in age discrimination being expressly prohibited in training programs and other terms, conditions and privileges of employment." (Assem. Floor Analysis, Conc. in Sen. Amends. to Assem. Bill No. 1599 (2001–2002 Reg. Sess.) as amended Aug. 22, 2002, p. 3.) The act as passed expressly provided, in an uncodified statement of legislative intent, that: "It is the intent of the Legislature in enacting this act to construe and clarify the meaning and effect of existing law and to reject the interpretation given to the law in Esberg v. Union Oil Company of California, 87 Cal.App.4th 378 [104 Cal.Rptr.2d 477] (2001)." (Stats. 2002, ch. 525, § 4.)[60]

The 2002 amendments became effective on January 1, 2003. In addition to adding age as a protected classification in section 12940, subdivision (a), which defines unlawful employment practices by employers, the amendments, among other things, added age as a prohibited basis of discrimination under subdivision (d), which applies to employment agencies as well as employers.[61]

> B. *Principles governing retroactivity and their application to the 2002 FEHA amendments.*

The principles applicable to a determination of retroactivity are described in *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243–244 [62 Cal.Rptr.2d 243, 933 P.2d 507] (*Western Security*). Statutes do not operate retrospectively—that is, operate to change the legal consequences of past events—unless the Legislature plainly intended them to do so. (*Id.* at p. 243.) When the Legislature plainly intends retrospective operation, the court is obliged to carry out that intent unless due process considerations require otherwise. (*Ibid.*)

---

[60] Assembly Bill No. 1599 cites the Court of Appeal decision in *Esberg*. However, when the bill was passed in August 2002, the Supreme Court had already (on June 24, 2002) issued its decision.

[61] Government Code, section 12940, subdivision (d) now provides that: "It shall be an unlawful employment practice . . . [¶] (d) For any employer or employment agency to print or circulate or cause to be printed or circulated any publication, or to make any non-job-related inquiry of an employee or applicant, either verbal or through use of an application form, that expresses, directly or indirectly, any limitation, specification, or discrimination as to race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation, or any intent to make any such limitation, specification or discrimination. Nothing in this part prohibits an employer or employment agency from inquiring into the age of an applicant, or from specifying age limitations, where the law compels or provides for that action."

A corollary to these principles is that a statute which merely clarifies existing law, rather than changing it, does not operate retrospectively, "because the true meaning of the statute remains the same." (*Western Security, supra,* 15 Cal.4th at p. 243.) A legislative declaration of a statute's meaning is given due consideration, but is not conclusive. "Ultimately, the interpretation of a statute is an exercise of the judicial power the Constitution assigns to the courts." (*Id.* at p. 244.) While a court need not accept a legislative assurance that an unmistakable change in the law is merely a clarification, the Legislature's declaration of intent "may still effectively reflect the Legislature's purpose to achieve a retrospective change." (*Ibid.*) In that case, the court must give effect to the Legislature's intent unless there is a constitutional impediment to doing so. (*Ibid.*)

 Applying the *Western Security* principles, we first conclude that, despite the Legislature's declaration of its intention "to construe and clarify the meaning and effect of existing law," the FEHA amendments in fact changed then-existing law in several ways, including its application to employment agencies. Government Code, former section 12940, subdivision (d), which applied to employment agencies,[62] did not include age among the prohibited bases of discrimination. Former section 12941, which covered age discrimination, did not impose any liability on employment agencies. Moreover, the Legislative Counsel's Digest of Assembly Bill No. 1599, after describing existing provisions on unlawful employment practices by employment agencies, specifically stated that the amended provision "would add age to the bases of discrimination constituting these unlawful employment practices."[63] (Legis. Counsel's Dig., Assem. Bill No. 1599 (2001–2002 Reg. Sess.) Stats. 2002, ch. 525.) Consequently, so far as employment agencies are concerned, we are compelled to conclude that the FEHA amendments effected an unmistakable change in the law, rather than merely a clarification of existing law.

As *Western Security* instructs, however, we must give due consideration to the Legislature's declaration of intent, since it may reflect the Legislature's purpose to achieve a retrospective change in the law.[64] (*Western Security, supra,* 15 Cal.4th at p. 244.) As will appear, we can discern no clear

---

[62] Certain other subdivisions of Goverment Code section 12940 also apply to employment agencies, but are not relevant to this discussion.

[63] Committee reports and analyses or digests of the Legislative Counsel are relevant to the meaning of a statute "because it is reasonable to infer that all members of the Legislature considered them when voting on the proposed statute." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45–46, fn. 9 [77 Cal.Rptr.2d 709, 960 P.2d 513].)

[64] The court in *Western Security* also observed that "there is little logic and some incongruity in the notion that one Legislature may speak authoritatively on the intent of an earlier Legislature's enactment when a gulf of decades separates the two bodies." (*Western Security, supra,* 15 Cal.4th at p. 244.)

expression of the Legislature's intent to subject employment agencies to liability for conduct that predated the amendments. We therefore conclude that, as applied to employment agencies, those amendments may not be applied retroactively.

We do not decide whether the 2002 FEHA amendments are retroactive in their application to employers, or whether, as stated in Assembly Bill No. 1599, those amendments merely clarified existing law in that respect. That question is not before us. It is clear, however, that the expression of legislative intent in Assembly Bill No. 1599 is directed at existing law as it was interpreted in *Esberg*, and that *Esberg* had nothing to do with employment agency liability.[65] Moreover, the Legislature's intent to clarify the law and reject the *Esberg* holding does not necessarily mean the Legislature intended every provision of the 2002 amendments to apply retroactively. Indeed, while the Legislature stated its intent to clarify the law as applied in *Esberg*, the legislative analyses also clearly indicate that, in other respects, the Legislature intended to make substantive changes to existing law. The clearest example involves the application of the amendments to labor organizations. The final Assembly analysis states that, in addition to expressly prohibiting age discrimination in training and other terms, conditions and privileges of employment, the bill "adds age to the existing bases of discrimination outlawed by labor organizations." (Assem. Floor Analysis, Conc. in Sen. Amends. to Assem. Bill No. 1599, *supra*, p. 3.) The report proceeds to expressly state that labor organizations "do not fall under the existing age discrimination statute when they act as unions with respect to their members or with respect to employers. This bill closes this statutory loophole . . . ." (*Ibid.*)

Accordingly, while the Legislature clearly intended to "clarify . . . existing law" in some respects—to reject *Esberg*—it just as clearly intended to change the law in other respects. Assembly Bill No. 1599 does not expressly declare that any of its provisions are retroactive. In short, we cannot see any clear expression of legislative intent with respect to the retroactivity of the 2002 FEHA amendments as a whole. The most we can say is that the Legislature intended to clarify existing law by rejecting the court's decision in *Esberg*, which was unrelated to the liability of an employment agency. Absent a clear indication of legislative intent to subject employment agencies to liability for conduct that predated the amendments, we cannot construe the amendments to do so. (See *Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828,

---

[65] As described in the legislative history, Assembly Bill No. 1599 addressed the *Esberg* decision and resulted "in age discrimination being expressly prohibited in training programs and other terms, conditions and privileges of employment." (Assem. Floor Analysis, Conc. in Sen. Amends. to Assem. Bill No. 1599, *supra*, p. 3.) The legislative analysis specifically describes *Esberg* as holding "that it is permissible under FEHA for employers to discriminate on the basis of age in employee training programs." (*Id.* at p. 2.)

840 [123 Cal.Rptr.2d 40, 50 P.3d 751] [subjecting companies to liability for past conduct that was lawful when it occurred is impermissible unless there is an express intent of the Legislature to do so].) Therefore, since there is no clear legislative intent to impose retroactive liability on employment agencies, we apply the general presumption that statutes operate prospectively, and conclude the talent agencies have no direct liability under FEHA for conduct predating January 1, 2003. (See *id.* at p. 843 [ambiguity on the question of retroactivity requires court to construe statute as " 'unambiguously prospective' "], quoting *INS v. St. Cyr* (2001) 533 U.S. 289, 320, fn. 45 [150 L.Ed.2d 347, 121 S.Ct. 2271].)[66]

We proceed next to the questions raised by the appeals and the writ petition filed in the wake of the trial court's August 14, 2003 order relating to the writers' second amended complaints seeking relief under the UCL.

> VIII. *The writers are not required to allege potential competitive harm or likely consumer deception in order to state a claim under the UCL.*

The writers' second amended complaints allege that the discriminatory policies or practices of the employers and the talent agencies constitute unfair business practices within the meaning of the UCL because they deny equal employment opportunities to the writers on account of their age. The trial court sustained demurrers to the writers' UCL representative claims, with leave to amend. With respect to the employers, the trial court ruled the complaints must include "general allegations showing potential competitive harm or likely consumer deception." Similarly, the complaints against the talent agencies were to include allegations "generally explaining how Agency Defendant[s] aided and abetted Employer Defendants' potential competitive harm or likely consumer deception." We conclude the trial court's rulings were erroneous.

██ The UCL defines "unfair competition" to include "any unlawful, unfair or fraudulent" business act or practice. (Bus. & Prof. Code, § 17200.) It has long been settled that the UCL's "sweeping language" permits a court to enjoin

---

[66] In light of our conclusion, we need not consider whether any due process or other constitutional objection exists to retroactive application of the amendments.

ongoing wrongful business conduct "in whatever context such activity might occur." (*Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 111 [101 Cal.Rptr. 745, 496 P.2d 817] (*Barquis*) [construing predecessor statute].) The UCL is not confined to "anti-competitive" business practices. (*Ibid.*) Additionally, its coverage is not limited to "deceptive" practices. (*Ibid.*) A practice is enjoinable as unlawful "totally apart from its inherent 'fairness.' " (*Id.* at p. 112.) *Barquis* quoted with approval a commentator's note that it was difficult to discern any legislative purpose other than " 'to extend the meaning of unfair competition to anything that can properly be called a business practice and that at the same time is forbidden by law.' " (*Id.* at p. 113.)[67] Moreover, the Court of Appeal has expressly held that age discrimination in violation of FEHA is an unlawful employment practice that may be enjoined under the UCL, whose remedies are cumulative. (*Herr v. Nestle U.S.A., Inc.* (2003) 109 Cal.App.4th 779, 789 [135 Cal. Rptr. 2d 477] (*Herr*) [rejecting contention that UCL is intended to protect consumers and competitors, not employees].)[68]

Nonetheless, William Morris contends the trial court's ruling should be upheld for two reasons. Neither is meritorious. First, William Morris contends that the trial court sustained the agencies' demurrers for lack of specificity, not because potential competitive harm or likely consumer deception was required to state such a claim. We are unmoved by this contention, which requires us to ignore the plain words of the court's ruling, which were: "[T]he Court and litigants will benefit from additional pleadings tying Agency Defendants' alleged conduct to Plaintiffs' allegations regarding Employer Defendants' purported burdens on competition and consumers. Plaintiffs may amend to include allegations generally explaining how Agency Defendant[s] aided and abetted Employer Defendants' potential competitive harm or likely consumer deception."[69]

---

[67] See also *People v. E.W.A.P., Inc.* (1980) 106 Cal.App.3d 315, 319 [165 Cal.Rptr. 73] (trafficking in obscene matter is prohibited under the Penal Code and, when engaged in as a business practice, is an unlawful business practice; "[i]t is not necessary for the People additionally to allege that it is anticompetitive or harmful to the consumer of such products").

[68] The Supreme Court applied the UCL in an employment context in *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163 [96 Cal.Rptr.2d 518, 999 P.2d 706] (unlawfully withheld overtime wages may be recovered as restitution in a UCL action).

[69] The only thing the trial court said about the specificity of the allegations appeared in the footnote to the quoted text. In the footnote, the court merely explained that it was unnecessary to properly plead *both* unlawfulness *and* unfairness in order to satisfy UCL pleading requirements, but that "[n]evertheless, . . . [the writers'] unlawful allegations need more specificity." These words cannot be construed as referring to anything other than the court's statement in the text, that is, the complaints must include allegations explaining how the agencies aided and abetted the employers' potential competitive harm or likely consumer deception.

Second, William Morris contends the trial court was correct,[70] because the Supreme Court's "broad pronouncements in *Barquis* . . . are no longer consistent with the views of the Supreme Court," citing *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*). We disagree for several reasons, the most obvious of which is that *Cel-Tech* quotes the very same "broad pronouncements" the court made in *Barquis*, and nowhere suggests an intention to narrow them. (*Cel-Tech, supra*, 20 Cal.4th at pp. 180, 181, fn. 9 [noting that the Legislature has expanded the UCL's coverage since *Barquis*].)

A review of *Cel-Tech* confirms the conclusion that the *Barquis* pronouncements remain good law. *Cel-Tech* involved a claim of unfair competition between direct competitors, and in it the Supreme Court devised "a more precise test for determining what is unfair under the unfair competition law." (*Cel-Tech, supra*, 20 Cal.4th at p. 185.) The court required "that any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." (*Id.* at pp. 186–187.)[71] The court explicitly noted that "[n]othing we say relates to actions by consumers or by competitors alleging . . . 'fraudulent' or 'unlawful' business practices . . . ." (*Cel-Tech, supra*, 20 Cal.4th at p. 187, fn. 12.)

---

[70] The trial court apparently relied on statements in *Herr, supra*, 109 Cal.App.4th 779, to conclude that, while actual injury to competition is not required, allegations showing "potential competitive harm or likely consumer deception" *are* required. In *Herr*, the court rejected the defendant's argument that age discrimination was an "intra company" matter which was not injurious to competitors or consumers, stating that actual injury to competition is not a required element of a UCL violation. *Herr* went on to state that it was "self-evident" that older workers are frequently more highly compensated than younger workers, and therefore an employer who practices age discrimination may have an unfair competitive edge over employers who comply with FEHA. (*Herr, supra*, 109 Cal.App.4th at p. 790.) The trial court contrasted *Herr*'s "self-evident" principle with the circumstances in this case, where the employers have represented that hiring younger writers does not reduce their costs and the writers have not alleged otherwise. Since there is no "self-evident" harm to competition or consumers, the court concluded the writers must amend to include allegations showing potential competitive harm or likely consumer deception. While *Herr* said employers practicing age discrimination "may have an unfair competitive edge" over those who do not, the point appears to be unnecessary to its decision. Certainly, *Herr* did not expressly hold that potential competitive injury was necessary, and it said nothing about "likely consumer deception." Moreover, any such requirement would be contrary to the Supreme Court's clear statements in *Barquis*.

[71] Specifically, the court "adopt[ed] the following test: When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes Business and Professions Code, section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Cel-Tech, supra*, 20 Cal.4th at p. 187, fn. omitted.)

William Morris points to post-*Cel-Tech* cases suggesting that all claims of unfairness under the UCL "should be defined in connection with a legislatively declared policy . . . ." (*Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1166 [93 Cal.Rptr.2d 439]; see also *Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322, 353 [9 Cal.Rptr.3d 197] [" '*Cel-Tech* . . . may signal a narrower interpretation of the prohibition of unfair acts or practices in *all* unfair competition actions' "; where a claim of an unfair act or practice is predicated on public policy, " 'we read *Cel-Tech* to require that the public policy which is a predicate to the action must be "tethered" to specific constitutional, statutory or regulatory provisions' "], (quoting *Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845, 854 [128 Cal.Rptr.2d 389].) Even if that is so, it does not assist the agencies, because the writers are claiming that agency practices are "unlawful" as well as "unfair," and the claim of unfairness would in any event be "tethered to some legislatively declared policy" (*Cel-Tech, supra,* 20 Cal.4th at p. 186), as there is plainly a legislatively declared policy against age discrimination. In short, even if the *Cel-Tech* formulation defining unfair conduct applies, nothing in that formulation suggests that unfairness, in the context of an age discrimination claim, requires a showing of potential competitive harm or consumer deception. The *Barquis* principle—that unfair competition includes anything that is both a business practice and forbidden by law—remains, in our view, fully viable.

IX. *The trial court correctly ruled that it has no authority to award classwide backpay to the writers under the UCL.*

The writers seek an injunctive decree under the UCL preventing the employers from continuing to engage in the ageist hiring practices that have excluded them from the market for writing positions. They contend that an order compelling the employers to reimburse the class for wages lost as a result of these practices—classwide backpay—would be an indispensable part of the effectiveness of such injunctive relief, and that the UCL authorizes the trial court to effectuate an injunction through an award of backpay. The trial court ruled to the contrary, concluding the writers cannot obtain any form of monetary relief under the UCL. We affirm the trial court's ruling.

Business & Professions Code section 17203 describes the remedies available under the UCL. It authorizes the court to make orders: "as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, . . . or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." (Bus. & Prof. Code, § 17203.)

The writers concede they cannot obtain restitution under the second clause of the quoted language (the "restore" prong), because it is settled that restitution is available only if a defendant has wrongfully acquired funds or property in which a plaintiff has an ownership or vested interest. (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1149 [131 Cal.Rptr.2d 29, 63 P.3d 937] (*Korea Supply*).) However, the writers contend the trial court may order classwide backpay under the first clause of the quoted language (the "prevent" prong), which authorizes "such orders . . . as may be necessary to prevent" a practice that is unlawful under the UCL. The writers argue the UCL does not restrict the court's general equity jurisdiction, and the court may exercise the full range of its inherent equitable powers under the "prevent" prong. Therefore, in a class action, if the court were to determine that an order of classwide backpay into a fluid recovery fund were necessary to prevent the employers from maintaining their ageist hiring practices, and to deter others from similar practices, the court would have the authority to make such an order.

We cannot agree that the trial court has the authority to award backpay in a UCL class action. The writers' premise—that the court's inherent equitable powers are unrestricted in a UCL action—is fundamentally erroneous, and at odds with the Supreme Court's decisions construing the statute. We begin with some well-established principles, and then turn to the precedents.

■ First, while the scope of conduct covered by the UCL is broad, its remedies are limited. A UCL action is equitable in nature, and damages cannot be recovered. (*Korea Supply, supra,* 29 Cal.4th at p. 1144.) Prevailing plaintiffs "are generally limited to injunctive relief and restitution." (*Cel-Tech, supra,* 20 Cal.4th at p. 179.) There is a "balance struck in this state's unfair competition law between broad liability and limited relief." (*Korea Supply, supra,* 29 Cal.4th at p. 1152.) Consequently, any consumer may seek an injunction against unfair business practices, and "[a]ctual direct victims of unfair competition may obtain restitution as well." (*Ibid.*) The courts have not, however, expressly permitted any form of monetary relief that is not restitutionary in nature. The Supreme Court's most expansive description of the restitutionary relief potentially available is a statement that court orders under the "prevent" prong of Business and Professions Code, section 17203 "may encompass broader restitutionary relief, including disgorgement of all money so obtained [from the use of unfair business practices] even when it may not be possible to restore all of that money to direct victims of the practice." (*Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 129 [96 Cal.Rptr.2d 485, 999 P.2d 718](*Kraus*).)

■ Second, the Supreme Court has made it clear that "the Legislature did not intend [Business and Professions Code] section 17203 to provide

courts with *unlimited* equitable powers." (*Korea Supply, supra*, 29 Cal.4th at p. 1147.) More particularly, "[a] court cannot, under the equitable powers of section 17203, award whatever form of monetary relief it believes might deter unfair practices." (*Id.* at p. 1148.) Accordingly, the writers' claim that a trial court may award whatever "ancillary monetary relief" it deems necessary to effectuate an injunction is incorrect. Moreover, the relevant precedents counsel against expanding the monetary relief available under the UCL to include classwide backpay in the absence of any indication the Legislature intended to provide such a remedy. We briefly review the two most pertinent decisions, both of which declined an expansive construction of the court's general equitable power under section 17203.

In *Kraus*, the Supreme Court held that disgorgement of unfairly obtained profits into a fluid recovery fund is not an available remedy in a representative action brought under the UCL. (*Kraus, supra*, 23 Cal.4th at p. 121.)[72] In *Kraus*, the court reviewed the legislative history of the UCL, and concluded nothing in that history suggested fluid recovery was contemplated by the UCL itself. (*Kraus, supra*, at p. 129.) *Kraus* further observed that "the court's inherent equitable power may not be exercised in a manner inconsistent with the legislative intent underlying . . . ." the UCL. (*Id.* at p. 131, fn. 14.)[73] Because the Legislature expressly authorized fluid recovery in class actions (Code Civ. Proc., § 384), and did not sanction fluid recovery orders as an equitable power available to the court in other proceedings, the court "decline[d] to read the grant of equitable power in Business and Professions Code, section 17203 as encompassing the authority to fashion a fluid recovery remedy when the action has not been certified as [a] class action."[74] (*Kraus, supra*, 23 Cal.4th at p. 137.)

---

[72] A fluid recovery remedy "is necessary only when a defendant must disgorge money that is not to be returned to the persons from whom [the monies] were obtained . . . ." (*Kraus, supra*, 23 Cal.4th at p. 127.) Fluid class recovery is a "method of paying out damages after they have been recovered." (*Bruno v. Superior Court* (1981) 127 Cal.App.3d 120, 131, fn. 6 [179 Cal.Rptr. 342].) "The theory underlying fluid class recovery is that since each class member cannot be compensated exactly for the damage he or she suffered, the best alternative is to pay damages in a way that benefits as many of the class members as possible and in the approximate proportion that each member has been damaged, even though, most probably, some injured class members will receive no compensation and some people not in the class will benefit from the distribution; or, as one commentator states it, 'where funds cannot be delivered precisely to those with primary legal claims, the money should if possible be put to the "next best" use.' [Citation.]" (*Id.* at pp. 123–124.)

[73] "Except where legislative action impinges on the exercise of fundamental judicial powers and thus violates the separation of powers doctrine (Cal. Const., art. III, § 3), a statute may specify the remedy and/or relief available for violation of the statute and thereby limit the extent of equitable relief a court may grant." (*Kraus, supra*, 23 Cal.4th at p. 131, fn. 14.)

[74] "Authority to order fluid recovery has its source in the powers of the court when presiding over a class action, as now expressly confirmed in Code of Civil Procedure section 384." (*Kraus, supra*, 23 Cal.4th at p. 133.)

A few years later, in *Korea Supply*, the Supreme Court rejected the plaintiff's argument that a court's general equitable powers under Business and Professions Code, section 17203 were broad enough to encompass nonrestitutionary disgorgement of profits to an individual.[75] (*Korea Supply, supra*, 29 Cal.4th at p. 1147.) The court again explained that restitution is the only monetary remedy expressly authorized by section 17203 . Since nonrestitutionary disgorgement was not expressly authorized by the statute, "we determine whether the Legislature intended to authorize such a remedy under section 17203." (29 Cal.4th at p. 1146.) The court stated: "We have previously found that the Legislature did not intend section 17203 to provide courts with *unlimited* equitable powers. In *Kraus*, we rejected the argument . . . that the general grant of equitable authority in section 17203 implicitly permitted a disgorgement remedy—in that case, into a fluid recovery fund in a representative action. We found that since there was nothing in the express language of the statute or its legislative history indicating that the Legislature intended to provide such a remedy, the remedy was not available. [Citation.] Here, again, we find nothing to indicate that the Legislature intended to authorize a court to order a defendant to disgorge all profits to a plaintiff who does not have an ownership interest in those profits." (*Korea Supply, supra*, 29 Cal.4th at p. 1147.)

The court expressly considered the two separate prongs of Business and Professions Code, section 17203, and concluded that: "A court cannot, under the equitable powers of section 17203, award whatever form of monetary relief it believes might deter unfair practices. The fact that the 'restore' prong of section 17203 is the only reference to monetary penalties in this section indicates that the Legislature intended to limit the available monetary remedies under the act." (*Korea Supply, supra*, 29 Cal.4th at p. 1148, fn. omitted.)

From *Kraus* and *Korea Supply*, it is clear that the Legislature intended to limit the available monetary remedies under the UCL and, because classwide backpay is not expressly authorized, we must look to "whether the Legislature intended to authorize such a remedy under section 17203." (*Korea Supply, supra*, 29 Cal.4th at p. 1146.) The answer is clearly no. No intimation in the extensive description of the statute's legislative history in *Kraus* indicates that the Legislature intended to provide a backpay remedy in

---

[75] Korea Supply Company was a broker that represented a Canadian company in bidding to obtain a contract to supply the Republic of Korea with military equipment. Korea Supply would have obtained a fee of over $30 million had the bid been successful. An American company obtained the contract instead, despite the fact that the Canadian company's bid was $50 million lower and its equipment far superior. The award was allegedly the result of bribes and sexual favors. The broker sued the American company under the UCL, seeking disgorgement of the profits realized on the sale of the equipment to the Republic of Korea. (*Korea Supply, supra*, 29 Cal.4th at p. 1140.)

connection with the general equitable powers granted in Business and Professions Code section 17203.[76] Additionally, the writers do not point to anything in the legislative history to suggest a legislative intention to provide a backpay remedy under the UCL.[77] They merely cite general precedents predating *Kraus* and *Korea Supply* for the general proposition that the jurisdiction to enjoin includes all the inherent equitable powers necessary to provide complete relief.[78] But *Kraus* and *Korea Supply* clearly instruct that the court's equitable powers under the "prevent" prong of section 17203 are limited.

The writers point out that, while *Kraus* held that disgorgement of unfairly obtained profits into a fluid recovery fund is not an available remedy in a representative action under the UCL, the Legislature has expressly authorized disgorgement into a fluid recovery fund in class actions (Code Civ. Proc., § 384), and this is a class action. While that is so, it is irrelevant. The writers do not seek disgorgement of unlawfully obtained profits into a fluid recovery fund; they seek an award of classwide backpay into a fluid recovery fund.[79] It may well be that in a proper case a court may order disgorgement of profits

---

[76] Indeed, recent precedent casts some doubt over whether backpay is properly considered an equitable remedy. (See *Great-West Life & Annuity Ins. Co. v. Knudson* (2002) 534 U.S. 204, 218, fn. 4 [151 L.Ed.2d 635, 122 S.Ct. 708] [Congress treated backpay as equitable in Title VII "only in the narrow sense that it allowed backpay to be awarded *together with* equitable relief"].)

[77] The classwide backpay remedy suggested by the writers must be distinguished from the restitutionary backpay to employees authorized by the Supreme Court in *Cortez v. Purolator Air Filtration Products Co., supra,* 23 Cal.4th at page 168 (orders for payment of wages unlawfully withheld from an employee are a restitutionary remedy authorized by Business and Professions Code, section 17203; "while disgorgement to a fluid recovery fund of all profit defendant may have earned by withholding overtime wages is not permitted, defendant may be compelled to restore unpaid wages to its employees and former employees"; "[o]nce earned, those unpaid wages became property to which the employees were entitled").

[78] The writers particularly rely on the Supreme Court's decision in *People v. Superior Court (Jayhill)* (1973) 9 Cal.3d 283 [107 Cal.Rptr. 192, 507 P.2d 1400], in which the court concluded that in the absence of a statutory restriction, "a court of equity may exercise the full range of its inherent powers in order to accomplish complete justice between the parties, restoring if necessary the *status quo ante* as nearly as may be achieved." (*Id.* at p. 286.) The *Jayhill* case arose before the Legislature amended the UCL's predecessor statute to expressly recognize the court's inherent power to order restitution. *Jayhill* does not assist the writers because subsequent cases expressly state a court cannot, under the equitable powers of Business and Professions Code, section 17203, award whatever form of monetary relief it believes might deter unfair practices. (*Korea Supply, supra,* 29 Cal.4th at p. 1148.) Indeed, the writers seek something quite different from restoration of the status quo ante as approved in *Jayhill.*

[79] Backpay to compensate persons discriminatorily refused employment is a very different remedy from the disgorgement of ill-gotten gains obtained from an illegal practice. The latter is defined in *Kraus, supra,* 23 Cal.4th at p. 127 (disgorgement involves compelling a defendant "to surrender all money obtained through an unfair business practice even though not all is to be restored to the persons from whom it was obtained," or "surrender of all profits earned as a result of an unfair business practice regardless of whether those profits represent money taken directly from persons who were victims of the unfair practice").

into a fluid recovery fund in a UCL class action; at least one case has so held. (See *Corbett v. Superior Court* (2002) 101 Cal.App.4th 649, 655 [125 Cal.Rptr.2d 46] [where a class has properly been certified, a plaintiff in a UCL action may seek disgorgement of unlawful profits into a fluid recovery fund].) Fluid recovery in class actions, however, is merely a method of paying out damages after they have been awarded. (*Bruno v. Superior Court, supra,* 127 Cal.App.3d at p. 131, fn. 6.) The question is not whether the trial court could order fluid class recovery of a damages award; it is whether the trial court has the authority to award nonrestitutionary backpay under the UCL in the first instance. It does not. As the Supreme Court stated in *Korea Supply,* the "nonrestitutionary disgorgement remedy sought by plaintiff closely resembles a claim for damages, something that is not permitted under the UCL." (*Korea Supply, supra,* 29 Cal.4th at pp. 1150–1151.) So it is with the backpay remedy sought by the writers.

██ In sum, the rationale stated in *Kraus* and *Korea Supply* is controlling. The general grant of equitable authority in Business and Professions Code, section 17203 does not implicitly permit a nonrestitutionary backpay award, just as in *Kraus* and *Korea Supply* it did not implicitly permit a disgorgement remedy. Because there is "nothing in the express language of the statute or its legislative history indicating that the Legislature intended to provide . . . ." (*Korea Supply, supra,* 29 Cal.4th at p. 1147) a classwide backpay remedy, that remedy is not available. Accordingly, the trial court correctly sustained the employers' demurrers to the writers' UCL class claims, since the only remedy available to the writers is injunctive relief, which is obtainable to the same extent through the writers' representative actions.

## DISPOSITION

The writ petitions in No. B165638 are granted. Let a peremptory writ of mandate issue directing the trial court to vacate its order of January 16, 2003, sustaining the demurrers of the networks and studios and to enter a new and different order overruling the demurrers. Costs are awarded to the petitioners.

The motion to dismiss the appeals in the lawsuits against the talent agencies (No. B166009) is denied. The trial court's order of January 16, 2003 is affirmed to the extent it holds the appellants may not sue the talent agencies directly under the Fair Employment and Housing Act for conduct occurring prior to January 1, 2003, and is otherwise reversed. The causes are remanded with instructions to overrule the demurrers of the talent agencies to the first amended complaints. The appellants are to recover their costs.

The writ petition in No. B170564 is granted. Let a peremptory writ of mandate issue directing the trial court to vacate its order of August 14, 2003,

to the extent the order requires the petitioners to amend their claims under the unfair competition law to allege potential competitive harm or likely consumer deception, and to enter a new and different order overruling the demurrer of William Morris Agency to the petitioners' second amended complaint on that ground. Costs are awarded to the petitioners.

The trial court's order of August 14, 2003, is affirmed (No. B170629) to the extent it sustains, without leave to amend, the respondents' demurrers to the appellants' class claims under the unfair competition law. The respondents are to recover their costs.

Cooper, P. J., and Flier, J., concurred.

The petition of all real parties in interest for review by the Supreme Court was denied December 22, 2004. George, C. J., Werdegar, J., and Brown, J., did not participate therein.